# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### HELENA DIVISION

| | |
|---|---|
| STATE OF MONTANA,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>TALEN MONTANA, LLC, f/k/a PPL Montana, LLC, and NORTHWESTERN CORPORATION, d/b/a NorthWestern Energy, a Delaware Corporation<br><br>　　　　　　　Defendant. | CV 16-35-H-DLC-JCL<br><br><br>FINDINGS & RECOMMENDATION |

Plaintiff the State of Montana ("the State") commenced this action in state court, seeking a declaration that it owns the riverbeds used by Defendant Talen Montana, LLC ("Talen") and Northwestern Corporation ("Northwestern") (collectively "Defendants") for their hydroelectric facilities, and seeking monetary compensation for Defendants' use of those riverbeds. With Talen's consent, Northwestern removed the case to this Court based on federal question jurisdiction in April 2016. The State has filed an objection and motion to dismiss Talen's consent to Northwestern's notice of removal. The State also moves to remand this action to state court pursuant to 28 U.S.C. § 1447(c) on the ground that federal

question subject matter jurisdiction is lacking.

## I.   **Background**

This case arrives here with a rather lengthy and complicated procedural background.  In 2003, parents of Montana schoolchildren brought suit against PPL Montana, LLC in the Missoula division of this Court based on diversity jurisdiction, alleging that PPL was operating hydroelectric facilities on state-owned riverbeds.[1]  The plaintiffs argued that the riverbeds were part of Montana's school trust lands, and sought compensation from Talen for its use of the property.  The State intervened as a party plaintiff, and the parents were dismissed for lack of standing.  Talen then moved to dismiss the case for lack of subject matter jurisdiction on the ground that the State is not a citizen for purposes of diversity jurisdiction.  The Court granted the motion, and in November 2004 Talen filed suit in state court, seeking a declaration that the State was not entitled to compensation for Talen's use of the riverbeds.  The State counterclaimed, seeking a declaration that it owned the riverbeds and was entitled to collect rent from Talen.  The state court granted summary judgment to the State, holding that the State owned the riverbeds because the Clark Fork, Missouri, and Madison rivers were navigable

---

[1] PPL changed its legal name to Talen Montana, LLC in June 2015. (Doc. 13-3, ¶ 1).  Because the name change has no impact on the parties or issues in this case, the Court will simply refer to this entity by its current name, Talen.

for title under the equal-footing doctrine.  The Montana Supreme Court affirmed, likewise concluding that the rivers were navigable as a matter of law at the time of statehood in 1889, which meant that the State had acquired title to the riverbeds under the equal-footing doctrine.  *PPL Montana, LLC v. State of Montana*, 229 P.3d 421, 443 (Mont. 2010).

Talen petitioned the United States Supreme Court for a writ of certiorari, which was granted on the sole issue of whether the Montana Supreme Court erred in its application of the navigability for title doctrine. *PPL Montana, LLC v. Montana*, 132 S.Ct. 1215 (2012).  The Supreme Court reversed and remanded, holding that the Montana Supreme Court erred by disregarding the segment-by-segment approach to navigability for title, and by relying on evidence of present-day recreational use to assess navigability at the time of statehood.  *PPL Montana*, 132 S.Ct. at 1229, 1233-34.

In September 2013, NorthWestern entered a purchase and sale agreement for the purchase of  Talen's Montana hydroelectric facilities, including the facilities at issue here.  (Doc. 1-1, ¶7).  The acquisition was approved by the Montana Public Service Commission in September 2014. (Doc. 1-1, ¶8).

Before pursuing this litigation any further, the State and Talen stipulated in late March 2016 that the State would be realigned as the plaintiff and Talen would

be realigned as a defendant.  (Doc. 13-3, ¶ 2).  The State and Talen also stipulated to bifurcate issues of liability and damages, with all claims or defenses relating to navigability at the time of statehood to be adjudicated first.  (Doc. 13-3, ¶4).   Six days later, on March 31, 2016, the State filed its complaint on remand naming both Talen and NorthWestern as defendants.  (Doc. 13-4)  The State asks for a declaration that the State owns the land occupied by Defendants' hydroelectric facilities and seeks to recover rental payments.

On April 20, 2016, NorthWestern filed a notice of removal invoking this Court's federal question jurisdiction.  (Doc. 1).  Talen consented in writing to the removal. (Doc. 1-3).   The State has since filed two motions challenging the propriety of NorthWestern's removal and the subject matter jurisdiction of this Court.  First, the State has filed an Objection and Motion to Dismiss Talen's Consent to NorthWestern Corporation's Notice of Removal.  (Doc. 14).  The State argues Talen should be judicially estopped from consenting to removal based on federal question jurisdiction, which means that NorthWestern cannot satisfy the requirement that all defendants consent to removal.  Second, the State has filed a Motion for Remand on the ground that Northwestern has not met its burden of establishing that this Court has federal question subject matter jurisdiction.

## II.   <u>Legal Standards</u>

-4-

Under 28 U.S.C. § 1441(a), any "state-court action[] that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The "removal statute is strictly construed, and any doubt about the right of removal requires resolution in favor of remand." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (2009) (citing *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)). There is a strong presumption against removal jurisdiction, which means that the defendant always bears of the burden of establishing that removal is proper. *Gaus*, 980 F.2d at 566. The removing party must show both that there are grounds for federal jurisdiction and that it complied with the procedural requirements for removal. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988). If, at any time, the federal court finds that it lacks subject matter jurisdiction over a removed action, it must remand the case to state court. 28 U.S.C. § 1447(c). Remand may also be ordered based on defects in the removal procedure. 28 U.S.C. § 1447(c).

## III.   <u>Motion to Dismiss Talen's Consent to Removal</u>

The procedure for removing a case from state to federal court is set forth in 28 U.S.C. § 1446, as amended by the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758. The removal statute

provides that "each defendant shall have 30 days after receipt by or service on that defendant of the initial pleading or summons . . . to file a notice of removal."  28 U.S.C. § 1446(b)(2)(B).  The statute requires that "all defendants who have been properly served must join in or consent to the removal of the action."  28 U.S.C. § 1446(b)(2)(A).   The 2011 amendments specifically addressed the removal procedure for later-served defendants, making clear that in a case where "defendants are served at different times, and a later-served defendant files a notice of removal, any earlier-served defendant may consent to the removal even though that earlier-served defendant did not previously initiate or consent to removal."  28 U.S.C. § 1446(b)(2)(C).

While Talen has been part of this litigation since it first began several years ago, the State added NorthWestern as a defendant for the first time in March 2016 when it filed its complaint on remand from the United States Supreme Court. (Doc. 13-4).  NorthWestern was served with a copy of the complaint on April 1, 2016, which means the 30-day period for removal began to run at that time. NorthWestern filed its notice of removal on April 20, 2016, along with Talen's written consent to removal.

The State does not dispute that NorthWestern filed its notice of removal within thirty days of being served, but maintains the removal was nonetheless

defective because Talen's consent is invalid.  The State argues that Talen should be judicially estopped "from now asserting that federal question jurisdiction exists in this case"[2] because it took the opposite position when it moved to dismiss the State's initial complaint in November 2004.   Assuming Talen is judicially estopped from asserting federal question jurisdiction, the State maintains it is likewise precluded from consenting to NorthWestern's notice of removal. Without Talen's consent, the State argues, NorthWestern cannot meet the procedural prerequisites for removal and this case is subject to remand.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," particularly where doing so would prejudice the opposing party.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Whether the doctrine applies in a particular case depends on such factors as: (1) whether the party's later position is "clearly inconsistent with its earlier position," (2) whether the party succeeded in persuading the court to accept its earlier position, and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751.

---

[2] (Doc. 15, at 2).

The State argues these factors all weigh in favor of applying judicial estoppel to preclude Talen from now asserting that this Court has federal question jurisdiction.  The State notes that when Talen moved to dismiss the initial federal complaint for lack of subject matter jurisdiction in November 2004, it represented to the court in briefing that "[n]o party has asserted that this case involves federal claims" and argued that "absent a federal question, this Court's subject matter jurisdiction...turns on the State's assertion of diversity."  The State maintains the first factor for application of judicial estoppel is thus satisfied because Talen's current position in consenting to removal based on federal question jurisdiction is clearly inconsistent with its earlier position.  The State contends the second and third factors are also satisfied because Talen persuaded the Court to accept its position as evidenced by the fact that it prevailed on its motion to dismiss, and is now seeking an unfair advantage to the detriment of the State by consenting to removal.

Defendants interpret Talen's litigation conduct differently, and contend that all three factors weigh against applying judicial estoppel.  Defendants also argue as a threshold matter that the doctrine of judicial estoppel is simply inapposite, and applying it here to preclude Talen from consenting to NorthWestern's removal would run afoul of the later-served defendant rule as set forth in the Federal

Courts Jurisdiction and Venue Clarification Act of 2011.  The Court agrees.

To begin with, the State does not cite, and the Court has not found, any cases applying the doctrine of judicial estoppel to preclude an earlier-served defendant from consenting to removal initiated by a later-served defendant. Properly framed, the question presented is not whether Talen is judicially estopped from consenting to removal, but rather whether Talen has waived its right to consent to removal because of its litigation conduct.

The Ninth Circuit has made clear that a defendant may waive its own right to remove by litigating on the merits in state court after it is apparent that the case is removable.  *See Resolution Trust Corp. v. Bayside Developers*, 43 F.3d 1230, 1240 (9th Cir. 1994).  What is not so clear, however, is whether such litigation conduct may also serve to waive a defendant's right to consent to removal by a later-served defendant.

While it appears the Ninth Circuit has yet to address the issue, a number of district courts have recently held that litigation conduct of an earlier-served defendant does not prevent it from consenting to a later-served defendant's notice of removal.  *See e.g. Central West Virginia Regional Airport Authority v. Triad Engineering, Inc.*, 2016 WL 685086, *17-20 (S.D.W. Va. Feb. 18, 2016); *Vermillion Area Chamber of Commerce and Development Co. v. Eagle Creek*

*Software Services, Inc.*, 2016 WL 2851324, * 3-4 (D.S.D. May 13, 2016); *Eclipse Aesthetics LLC v. Regenlab USA, LLC,* 2016 WL 4800342, *3-4 (N.D. Tex. Sept. 12, 2016); *Bisso Marine Co., Inc. v. Techcrane Intern, LLC*, 2014 WL 4489618, *2 (E.D. La. Sept. 10, 2014).

As these cases reflect, applying the waiver doctrine to prevent an earlier-served defendant from consenting to removal by a later-served defendant would defeat the purpose of the later-served defendant rule as codified by the 2011 amendments to the removal statute. The amended statute expressly provides that an earlier-served defendant may consent to removal initiated by a later-served defendant "even though that earlier-served defendant did not previously initiate or consent to removal." 28 U.S.C. § 1446(b)(2)(C). Congress adopted this later-served defendant rule to provide "for equal treatment of all defendants in their ability to obtain Federal jurisdiction over the case against them." H.R. Rep. No. 12-10, at 14 (2011). "The rule acknowledges that '[f]airness to later-served defendants, whether they are brought in by the initial complaint or an amended complaint, necessitates that they be given their own opportunity to remove, even if the earlier-served defendants chose not to remove initially.'" *Act II Jewelry*, 2015 WL 7889039, *3 (quoting H.R. Rep. No. 112-10, at 14 (2011)). Congress "plainly intended for each defendant to have its own right to initiate removal." *Central*

*West Virginia Regional Airport Authority*, 2016 WL 685086, *20.

Applying the waiver doctrine to an earlier-served defendant would prevent all defendants from unanimously consenting to removal, thereby depriving the later-served defendant of its own right to remove and defeating the purpose of the later-served defendant rule. *Act II Jewelry*, 2015 WL 7889039, *3; *Central West Virginia Regional Airport Authority*, 2016 WL 685086; *19-20. Consistent with the caselaw set forth above, the Court concludes that the litigation conduct of an earlier-served defendant like Talen does not preclude it from consenting to removal by a later-served defendant, and has no effect on the later-served defendant's right of removal.

To the extent the State takes the position that the later-served defendant rule should not apply here because of the relationship between Talen and NorthWestern, the Court is not convinced. The State characterizes NorthWestern as Talen's "successor in interest,"[3] and contends that Talen's litigation conduct should be attributed to NorthWestern. According to the State, NorthWestern is thus bound by what the State calls "Talen's acknowledgment and assertion in this Court that there is no basis for federal jurisdiction on either federal question or diversity grounds" and the later-served defendant rule does not apply. (Doc. 15, at

---

[3] (Doc. 15, at 6 n. 2; Doc. 13, at 14-16).

6 n. 2).

The later-served defendant rule may not apply when multiple "defendants are actually part of the same operating entity rather than separate and distinct entities." *RCM International*, 2014 WL 6844944 *4 (N.D. Cal. Dec. 4, 2014) (quoting *Eltman v. Pioneer Communications of America, Inc.*, 151 F.R.D. 311, 318 n.15 (N.D. Ill. 1993)).  But the State has not pointed to any evidence demonstrating that Talen and NorthWestern are actually part of the same operating entity.  There is no evidence that the two entities merged when NorthWestern acquired Talen's hydroelectric facilities, or that NorthWestern assumed Talen's liabilities for rents accruing before the acquisition.  That Talen and NorthWestern are separate and distinct entities is reflected by the fact that State seeks rent from each entity for different periods of time.  Absent some showing that  Talen and Northwestern are so closely affiliated that they can be considered part of the same operating entity, the later-served defendant rule controls.

Because the removal statute expressly allows a later-served defendant like NorthWestern to remove and Congress clearly intended that each defendant be given the opportunity to remove, the Court concludes that an earlier-served defendant's litigation conduct does not constitute a waiver of its right to consent to a later-served defendant's notice of removal.  The State's objection and motion to

-12-

dismiss Talen's consent to NorthWestern's Notice of Removal should be denied accordingly.

## IV.   **Motion to Remand**

The State also moves to remand this case to state court on the ground that NorthWestern has not met its burden of establishing federal question subject matter jurisdiction.

### A.   **Successor in interest**

The State first argues remand is proper because NorthWestern, as Talen's successor in interest, takes this action as it finds it and is thus bound by Talen's choice of a state forum.  According to the State, Talen conceded this litigation does not present a federal question when it successfully moved to dismiss the State's initial federal complaint for lack of subject matter jurisdiction in November 2004.  Talen argued in support of its motion to dismiss that "[n]o party has asserted that this case involves federal claims," and wrote that "absent a federal question, this Court's subject matter jurisdiction over the State's Complaint turns on the State's assertion of diversity."  The State characterizes this as a concession on Talen's part that federal question jurisdiction was lacking, and emphasizes that it was Talen who then chose a state court forum for its declaratory judgment action.

Talen and the State litigated their dispute in state district court, through appeal to the Montana Supreme Court, and before the United States Supreme Court on a writ of certiorari.   The State argues that when it filed its state court complaint on remand from the United States Supreme Court, it did not raise any new legal theories or claims, and "merely added NorthWestern as a Defendant, as the successor-in-interest to Talen." (Doc. 13, at 15).  Because the State claims to have added NorthWestern only in its capacity as Talen's successor-in-interest, the State contends that NorthWestern takes the case as it finds it and cannot now seek to establish federal jurisdiction for claims that its predecessor previously placed in state court.

For support, the State relies on Federal Rule of Civil Procedure 25(c), which governs the substitution of parties in cases where a party transfers an interest during litigation.  Fed. R. Civ. P. 25(c) states that "[if] an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  The purpose of Fed. R. Civ. P. 25(c) "is to allow an action to continue unabated when an interest in a lawsuit changes hands," which means that nothing need be done after an interest has been transferred.  6 James W.  Moore, Moore's Federal Practice § 25.33[2] 3rd ed. rev. 2011).  "The action may be

-14-

continued by or against the original party, and the judgment will be binding on his

successor in interest even though he is not named." 6A Charles A. Wright et al.,

Federal Practice and Procedure: Civil 2D § 1958, at 555 (1990).

The State then cites a handful of federal court decisions for the proposition

that an action "continues unabated" [4] with no substantive change following the

joinder of a successor in interest, and the merits of the case "are still determined

vis-a-vis the originally named parties." *Pacamor Bearings, Inc. v. Minebea Co.*,

892 F.Supp. 347, 360 (D. N.H. 1995). *See also Minnesota Mining and Mfg. Co. v.*

*Eco Chem, Inc.*, 757 F.2d 1256, 1257 (Fed. Cir. 1985); *TV Reception Corp. v.*

*Dunbar*, 426 F.2d 174, 177-78 (6th Cir. 1970).  As the State sees it, this means that

NorthWestern is bound by Talen's litigation decisions and this case should

continue unabated in state court.

The problem with the State's argument, however, is that Fed. R. Civ. P.

25(c) is simply inapplicable on these facts.  For one thing, because this case was

not pending in federal court when the State filed its complaint on remand, any

attempt on the State's part to substitute or join NorthWestern as a defendant would

---

[4] *In the Matter of Covington Grain Co.*, 638 F.2d 1362, 1364 (5th Cir. 1981).

-15-

have been governed by state rather than federal rules of procedure.[5]  In Montana, the substitution of parties in cases where there has been a transfer of interest is controlled by Montana Rule of Civil Procedure 25(c), which is identical to its federal counterpart.  When the State assumed the role of plaintiff on remand, however, it did not move to substitute or join NorthWestern as a defendant under Mont. R. Civ. P. 25(c) or its federal counterpart.  Nor did it choose to simply continue the case unabated with the original parties, with the hope of binding NorthWestern to any judgment obtained against Talen.

Instead, the State filed a complaint on remand naming both Talen and NorthWestern as defendants.  The State is not alleging that NorthWestern is liable for rents accruing when Talen owned the hydroelectric facilities, and is instead seeking to hold each defendant liable for past rent accruing during its period of ownership, and as against NorthWestern, effectively into the future.  Because Fed. R. Civ. P. 25(c) and its state counterpart are both inapposite, the cases the State cites for the proposition that NorthWestern steps into this case as it finds it and should be bound by Talen's decision to litigate in state court are of no persuasive value.

---

[5]Montana Rule of Civil Procedure 25(c) controls the substitution of parties and is identical to its federal counterpart.

The State chose to add NorthWestern as a party of its own volition when it filed its complaint on remand. Consequently, NorthWestern has its own right to initiate removal.  As discussed above, because the State has not shown that Talen and NorthWestern are so closely affiliated that they should be considered part of the same operating entity, the later-served defendant rule controls.  While the Court rejects the State's argument that NorthWestern is bound by Talen's decision to litigate in state court,  NorthWestern must still meet its burden of establishing that removal was proper based on federal question jurisdiction.

### B.    "Arising Under" Jurisdiction

The federal question statute gives the district courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  A case "arises under" federal law for purposes of § 1331 when (1) the plaintiff pleads a cause of action created by federal law, or (2) state law claims "implicate significant federal issues."  *Grable & Sons Metal Products, Inc. v. Darue Engraving & Manufacturing*, 545 U.S. 308, 312 (2005). Under the well pleaded complaint rule, whether a federal question is presented must be determined by looking to the face of the plaintiff's complaint, "unaided by the answer or by the petition for removal." *California ex rel. Lockyer v. Dynergy, Inc.*, 375 F.3d 831, 838 (9th Cir. 2004) (quoting *Gully v. First National Bank*, 299

U.S. 109, 113 (1936)).

NorthWestern argues that both forms of "arising under" jurisdiction are present here, and that each provides an independent basis for removal.  First, NorthWestern maintains that the State's claim of title to the riverbeds based on the equal footing doctrine arises under federal law because the claim is created by the United States Constitution.

The equal footing doctrine is grounded in Article IV, § 3 of the United States Constitution, and was first enunciated by the United States Supreme Court in *Pollard's Lessee v. Hagan*, 44 U.S. 212, 213 (1845).  The doctrine provides that new states enter the Union on an equal footing with the original states, and upon their admission to the Union acquire the land under navigable water within their borders.  See *Block v. North Dakota,* 461 U.S. 273, 277 (1980).

The equal footing doctrine has been a central part of this litigation since it began several years ago, and the State invokes the doctrine again in its complaint on remand.  As it has all along, the State claims title to the disputed riverbeds based on the equal footing doctrine, alleging specifically that "upon admission to the Union, Montana acquired title to the beds and banks of navigable waters in Montana at issue herein on an equal footing with the established states."  (Doc. 13-4, ¶ 15).  The United States Supreme made clear when considering this matter

-18-

on certiorari that title under the equal footing doctrine is conferred "by the Constitution itself" and any "questions of navigability for determining state riverbed title are governed by federal law." *PPL Montana*, 132 S.Ct. at 1227. Citing these principles, NorthWestern maintains that the State's claim of title to the riverbeds is created by the United States Constitution, thereby giving rise to federal question jurisdiction.

While there can be no doubt that the equal footing doctrine is a creature of federal constitutional law, the doctrine does not create an independent cause of action. This is reflected on the face of the State's well-pleaded complaint, which invokes the equal footing doctrine but sets forth only state law causes of action. The State's first claim is for declaratory relief, which asks for a declaration "pursuant to Montana's ownership rights under the [Montana] Enabling Act [of February 22, 1889], the Montana Constitution, and Montana statutes" that Defendants' power sites occupy submerged lands owned by the State, and that the State is entitled to compensation for the use of those lands. (Doc. 13-4, ¶ 40). The State's second and third claims are for uncompensated use of state lands and unjust enrichment, respectively. Those claims similarly allege that pursuant to the State's "ownership rights under the Enabling Act, the Montana Constitution, and Montana statutes," Defendants are obligated to pay the State for using state lands

-19-

as power sites. (Doc. 13-4, ¶¶ 42-50).

Obviously, NorthWestern does not dispute that the State holds title to the riverbeds of navigable waters in Montana.  But NorthWestern nonetheless argues that to prevail on any of its claims, the State will have to prove that the riverbeds for which it claims entitlement to rent underlie navigable waters – which necessarily implicates the equal footing doctrine.  But the fact that the State's state law claims implicate a federal constitutional doctrine does not mean those claims are "created by" federal law for purposes of establishing federal question jurisdiction.  Defendants do not cite any authority for the proposition that the equal footing doctrine confers a right of action on the State to sue corporate entities within the state over real property ownership or for rent.  The State's coercive claims for compensation are "created by" Montana law, not federal law. *See Cedar Creek Land & Timber, Inc. v. Guy*, 2015 WL 728107 *3 (S.D. Ala. Feb. 18, 2015).  Because the State's well pleaded complaint does not identify any federally created causes of action, NorthWestern has not met its burden of showing that the first form of "arising under" jurisdiction exists.

Moving to the second form of "arising under" jurisdiction, NorthWestern argues that even if the State's claims are characterized as state law claims they "arise under" federal law for purposes of federal question jurisdiction because they

implicate significant federal issues regarding application of the equal footing

doctrine.  This type of jurisdiction applies to a "special and small category of

cases," and "captures the commonsense notion that a federal court ought to be able

to hear claims recognized under state law that nonetheless turn on substantial

questions of federal law." *Grable & Sons Metal Products, Inc. v. Darue*

*Engineering & Mfg.*, 545 U.S. 308, 312 (2005).

    To establish federal question jurisdiction over a state law claim, the

removing party must show that a federal issue is "(1) necessarily raised, (2)

actually disputed, (3) substantial, and (4) capable of resolution in federal court

without disrupting the federal-state balance approved by Congress."  *Gunn v.*

*Minton*, 133 S.Ct. 1059, 1065 (2013); see also *Grable*, 545 U.S. at 314.  These

factors are conjunctive, and all must be satisfied to establish federal question

jurisdiction.

    The first *Gunn* factor is clearly satisfied here because the State cannot

prevail on its state law claims for compensation without establishing that it took

title to the disputed riverbeds under the equal footing doctrine because the

stretches of the riverbeds at issue underlie navigable waters.  The State expressly

bases its claim of title to the disputed riverbeds on the equal footing doctrine, and

the United States Supreme Court has made clear questions of navigability for

-21-

determining state riverbed title under the equal footing doctrine are governed by federal law.  *PPL Montana*, 132 S.Ct. at 1227.

The State nonetheless appears to argue in its opening brief, somewhat obliquely, that its state law claims do not necessarily raise any issues of federal law. (Doc. 13, at 18-20).  The State begins with the well-established proposition that if the equal footing doctrine vested title to submerged lands under navigable waters with a new state upon its entry to the Union, the doctrine's role ends and subsequent questions of land title are governed by state rather than federal law. *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 376-377 (1977).  The State then characterizes the dispute in this case as centering not on the equal footing doctrine, but on "whether a private riparian landowner takes property to the meander line of the river or whether Montana takes the property below the river for purposes of rental payment under Montana statute." (Doc. 13, at 20).  The State contends this dispute is governed by state law because "application of the equal footing doctrine ended upon Montana's admission to the Union."  (Doc. 13, at 20).

This case may well involve a number of state law issues.  But for present purposes, the question is whether the State's claims also raise a federal issue for purposes of establishing federal subject matter jurisdiction.  In its reply brief, the

State does not seem to dispute that its state law claims necessarily raise a federal issue insofar as they rest on a determination that the stretches of riverbeds at issue underlie navigable waters to which the state took title under the equal footing doctrine when it was admitted to the Union in 1899.  The State has expressly stipulated as much, agreeing with Talen before filing its complaint on remand in state court to bifurcate "[t]he issues of liability/navigability and damages."  (Doc. 80, at 1).  The State and Talen agreed that "[a]ll claims or defenses relating or pertaining to navigability at the time of statehood (the 'navigability claims') initially shall be adjudicated to conclusion in this Court," that is, the state court. (Doc. 80, at 1-2).  Their stipulation further specifies that all "remaining claims shall be adjudicated if and as necessary following final adjudication of the navigability claims by this Court."  (Doc. 80, at 2).  Because the State's state law claims necessarily implicate the navigability for title test under the equal footing doctrine, which is a federal issue, the first *Gunn* factor is satisfied.

The second *Gunn* factor is also satisfied because there is an actual dispute as to whether the State took title to the riverbed stretches at issue under the equal footing doctrine.  The State looks at this factor differently, however, and maintains there is no actual dispute over any federal issue because the meaning and effect of the equal footing doctrine is well-settled and "has been developed, refined, and

applied by federal courts for nearly two centuries." (Doc. 116, at 7 (quoting *Cedar Creek*, 2015 WL 728107 *5)). Of particular relevance here, the United States Supreme Court's *PPL Montana* decision did much to clarify the navigability for title test under the equal footing doctrine. *PPL Montana,* 132 S.Ct. at 1229-34. But even assuming there is no actual dispute as to the legal meaning and contours of the equal footing doctrine, the parties do actually dispute how the doctrine applies here and whether the State took title to the riverbeds underneath Defendants' hydroelectric facilities pursuant to the navigability for title test. The State's state law claims thus present a federal issue that is actually disputed, thereby satisfying the first two *Gunn* factors.

As the State accurately points out, however, the "mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharmaceutical, Inc. v. Thompson,* 478 U.S. 804, 813 (1986). To satisfy the third *Gunn* factor, NorthWestern must demonstrate that the federal issue raised is "substantial." For a federal issue to be considered substantial, it is not enough that it "be significant to the particular parties in the immediate suit." *Gunn*, 133 S.Ct. at 1066. Rather, the substantiality inquiry "looks instead to the importance of the issue to the federal system as a whole." *Gunn*, 133 S.Ct. at 1066. The United States Supreme Court has said by way of

example that a state law claim raises a substantial federal issue if the government

has a direct interest in the availability of a federal forum, the constitutional

validity of an act of Congress is in question, or there is a need to develop a

uniform body of law.  *Gunn*, 133 S.Ct. at 166.

The Supreme Court has also distinguished between cases involving "pure

issues of law" that would be "dispositive of the case and controlling in numerous

other cases" and cases where the federal inquiry is "fact-bound and situation-

specific." *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 700

(2006).   Cases in the first category are more likely to present a substantial federal

issue because a federal court may settle the issue "once and for all."  *Empire*, 547

U.S. at 700.   Conversely, cases in the second category are less likely to present a

substantial federal issue because fact-bound issues and situation-specific claims

typically have little application beyond the parties and are not as important to the

federal system as a whole.  See *Empire Healthchoice*, 547 U.S. at 701; *Merced*

*Irrigation Dist. v. Co. of Mariposa,* 941 F.Supp.2d 1237, 1248 (E.D. Ca. 2013).

According to the State, this case falls into the latter of these two categories.

The State maintains the issue of whether the river segments occupied by

Defendants' hydroelectric facilities were navigable for purposes of riverbed title

under the equal footing doctrine is not "substantial" for purposes of establishing

-25-

federal question jurisdiction because it is fact-bound and situation-specific.

The Court agrees.

The United States Supreme Court's *PPL Montana* decision remanding this matter for further proceedings makes clear that what remains at this point are fact-bound and situation-specific issues regarding application of the navigability for title test. When the Supreme Court accepted certiorari, it was presented with what the State concedes was a substantial federal question concerning the correct legal test for determining navigability for title under the equal footing doctrine.[6] The Supreme Court settled that question, holding that a segment-by-segment approach to navigability for title applies pursuant to which the proper inquiry is "whether the segment, under which the riverbed in dispute lies, is navigable or not." *PPL Montana*, 132 S.Ct. at 1229. The Supreme Court clarified that "portages may defeat navigabilty for title purposes," and found they did so with respect to a 17-mile stretch of the Missouri River known as the Great Falls reach. *PPL Montana*, 132 S.Ct. at 1232.

The Supreme Court further held that "[e]vidence of present-day use may be considered to the extent it informs the historical determination whether the river segment was susceptible of use for commercial navigation at the time of

_____

[6] Doc. 13 at 24.

statehood," and explained what such a susceptibilty analysis requires. *PPL Montana*, 132 S.Ct. at 1233.  Having clarified the rules of navigability for title under the equal footing doctrine, the Supreme Court reversed the judgment of the Montana Supreme Court and remanded the case for further proceedings.  *PPL Montana*, 132 S.Ct. at 1235.

The dispositive issue on remand is whether the river stretches still in dispute satisfy the navigability for title test as clarified in *PPL Montana.*  To make this determination, the presiding court will have to engage in a fact intensive, situation specific inquiry into the navigability of each river stretch.  Applying the navigability for title test to the facts established as a result of that inquiry may be of vital significance to the parties, but will have little impact on the federal system as a whole.  Because the federal issue embedded in the State's claims is fact-bound and situation-specific, it is of little importance to the federal system as a whole and is not substantial for purposes of establishing federal question jurisdiction.

The court in *Cedar Creek* reached much the same conclusion, holding under similar circumstances that the navigability for title inquiry under the equal footing doctrine is not a substantial federal issue giving rise to federal question jurisdiction.  *Cedar Creek,* 2015 WL 72810 * 5.  In *Cedar Creek*, a timber company brought an action in state court against the state of Alabama, seeking to

quiet title to disputed riverbeds.  *Cedar Creek*, 2015 WL 72810 *1.  The state

removed the case to federal district court based on federal question jurisdiction,

contending that the timber company's state law claims arose under the equal

footing doctrine.  *Cedar Creek*, 2015 WL 72810 *2.   The district court granted

the timber company's subsequent motion to remand, finding that application of the

equal footing doctrine did not present a substantial federal question "given the

fact-bound and situation-specific nature of the dispute."  *Cedar Creek*, 2015 WL

72810 *6.

 Although the court did not specifically discuss the *PPL Montana* decision, it

pointed out that "[t]he equal footing doctrine has been developed, refined and

applied by federal courts for nearly two centuries."  *Cedar Creek*, 2015 WL 72810

*5.  The court noted there was no indication that the action before it would

"require trailblazing exploration of heretofore-uncharted tributaries of that

doctrine," and found to the contrary that "the legal waters (with respect to the

equal footing doctrine) appear to be well-marked and extensively navigated, with

the shoals, currents and rapids clearly defined in the extant cartography."  *Cedar

Creek*, 2015 WL 72810 *5.  Because the parties were simply "requesting judicial

application of these settled federal constitutional principles to a fact-bound and

situation-specific context," the court concluded that "resolution of the federal

issues embedded in the parties' dispute" had "negligible significance to the federal system as a whole, and the 'substantiality' prong of federal question jurisdiction" was thus lacking. *Cedar Creek*, 2015 WL 2810 *5.

Here, as in *Cedar Creek*, the presiding court will be called on to apply settled federal constitutional principles to a fact-bound and situation specific context. The Supreme Court's *PPL Montana* decision clarified the navigability for title test under the equal footing doctrine, thereby settling the legal standard governing the rest of this case. Because the contours of the equal footing doctrine as it applies here are well-mapped, all that remains is for the presiding court to determine title to the disputed riverbeds by applying the controlling legal standard to the specific facts of this case.

NorthWestern argues this Court should instead follow the North Carolina federal court's divergent decision in *North Carolina v. Alcoa Power Generating, Inc.*, 98 F.Supp.2d 479, 481 (E.D. N.C. 2013). In *Alcoa*, the state of North Carolina sued a utility company seeking to establish riverbed title under the equal footing doctrine. *Alcoa*, 98 F.Supp.2d at 480. The utility company removed the case, and the federal court concluded it had federal question jurisdiction because the question of whether the state held title to the riverbeds under the equal footing doctrine presented a substantial federal issue. *Alcoa*, 98 F.Supp.2d at 482. But

unlike the court in *Cedar Creek,* the *Alcoa* court provided virtually no rationale for its conclusion and  did not specifically address the *Gunn* factors.  Nor did it consider *Empire Healthchoice,* which establishes that a case where the federal inquiry is fact-bound and situation-specific is less likely to present a substantial federal issue than a case involving pure issues of law.  In addition, it seems the court failed to place the burden of demonstrating federal question removal jurisdiction on the state, noting as it did that the state had "not demonstrated that this Court's federal question jurisdiction is doubtful."  *Alcoa*, 989 F.Supp.2d at 482.  For these reasons, the Court finds that *Alcoa* is of little persuasive value. NorthWestern's attempts to distinguish *Cedar Creek* are unavailing and the Court accepts that case as persuasive.

NorthWestern also cites *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9 (1983) for the broad proposition that federal question jurisdiction exists where there is a dispute about the application of federal law.  (Doc. 94, at 17).  In the midst of discussing the general principles of "arising under" jurisdiction, the Supreme Court recognized that "[l]eading commentators have suggested that for purposes of § 1331 an action 'arises under' federal law 'if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability of his case to a

proposition of federal law." *Franchise Tax Board*, 463 U.S. at 9.

Even assuming this statement can be read to mean that cases requiring application of federal law may in some situations raise a substantial federal issue, the subsequent *Empire Healthchoice* decision clarifies that if the federal issue raised is fact-bound and situation specific, it is far less likely to be "substantial." *Empire Healthchoice*, 547 U.S. at 701.  As set forth above, the federal issues raised here fall into this category.

Taking a somewhat different tack, NorthWestern recognizes that *PPL Montana* did much to clarify the equal footing doctrine and navigability for title test, but argues several legal issues remain.  First, NorthWestern maintains *PPL Montana* left open the question of when a nonnavigable segment of river might be so small that it merits treatment as part of a longer, navigable reach.  (Doc. 94, at 22) (citing *PPL Montana*, 132 S.Ct. at 1230).  What the Supreme Court actually said, however, is that even if the law recognized such an exception, "it is doubtful that any of the segments in this case would meet that standard, and one – the Great Falls reach – certainly would not."  *PPL Montana*, 132 S.Ct. at 1230.  The Supreme Court provided additional clarification, stating that "the kinds of considerations that would define [such a] *de minimis* exception to the segment-by-segment approach would be those related to principles of ownership and title, such

as the inadministrability of parcels of exceedingly small size, or worthlessness of the parcels due to overdivision." *PPL Montana*, 132 S.Ct. at 1231.  Under that standard, "[a] comparison of the nonnavigable segment's length to the overall length of the stream" would be irrelevant. *PPL Montana*, 132 S.Ct. at 1231.  In other words, the question as NorthWestern poses it was answered by reference to an established body of law.  With this by way of guidance, the presiding court's task on remand will not be to further refine the legal contours of the navigability for title test as NorthWestern suggests, but to apply that settled test to the facts as instructed by the Supreme Court.

Second, NorthWestern maintains that substantial federal issues will be raised on remand because the Supreme Court "directed further inquiry into legal issues surrounding evidence of present-day, recreational use to demonstrate navigability at statehood." (Doc. 94, at 22).  There are issues for litigation, bu tnot legal issues. The Supreme Court discussed the extent to which evidence of present-day use may be considered for purposes of assessing navigability at the time of statehood, and articulated the legal standard that a party seeking to use such evidence must satisfy.  *PPL Montana*, 132 S.Ct. at 1233.  Because the Montana Supreme Court applied the wrong standard and did not make the necessary findings, the Supreme Court held its "reliance upon the State's evidence

-32-

of present-day, recreational use, at least without further inquiry, was wrong as a matter of law."  This statement does not direct further inquiry into legal issues, but rather makes clear that the court should consider factual evidence of present-day recreational use in light of the articulated legal standard.  Because this inquiry is largely fact-bound and situation-specific, it is of negligible significance to the federal system as a whole and does not present a substantial federal issue.

Third, NorthWestern maintains the United States Supreme Court left a substantial federal issue unresolved when it decided *PPL Montana* because it did not address the burden of proof regarding navigability.   On appeal, PPL argued the state court erred by applying a "liberal construction of the navigability test, which did not place the burden of proof upon the State to show navigability." *PPL Montana*, 132 S.Ct. at 1226.  Because the Supreme Court reversed on other grounds, however, it "decline[d] to decide whether the Montana Supreme Court further erred as to the burden of proof regarding navigability."  *PPL Montana*, 132 S.Ct. at 1234.

As these statements reflect, however, the question bypassed by the Supreme Court related to the state court's application of the navigability for title test, not the test itself.  It is undisputed that as the party seeking to establish title under the equal footing doctrine, the State bears the burden of proving navigability by a

-33-

preponderance of the evidence.  *See United States v. Oregon*, 295 U.S. 1, 14

(1935).  The Montana Supreme Court recognized as much, finding as it did that

"[t]he evidence presented by the State was clearly sufficient to demonstrate

navigability in fact under this test, and entitlement to judgment as a matter of law."

*PPL Montana v. State*, 355 Mont. at 439.  The dissent agreed that "the State met

its initial burden to prove navigability under the title test," thereby confirming that

the burden of proving navigability lies with the State.  *PPL Montana v. State*, 355

Mont. at 477.

    For purposes of these proceedings, whether the Montana Supreme Court

erred by failing to hold the State to its burden of proof is immaterial.  As the case

moves forward from here, the presiding court will be called on to apply settled

principles of federal law to the facts, and determine whether the State can meet its

burden of proving by a preponderance of the evidence that river stretches still in

dispute were navigable at the time of statehood.  This is a fact-bound and

situation-specific inquiry, which is of little importance to the federal system as a

whole and does not present a substantial federal issue.

    In another attempt to convince the Court that the State's claims raise a

substantial federal issue, NorthWestern argues that the outcome here will have far

reaching implications for other landowners. NorthWestern anticipates that if the

State prevails on any of its claims for title, its constitutional trust obligation to maximize revenue from state lands will compel it to bring similar claims against other users of the riverbeds. The possibility that the State may initiate litigation against other riverbed users if it prevails here is tenuous, at best, and is not enough to convince the Court that the situation-specific factual issues at hand are important to the federal system as a whole.

For the reasons set forth above, the Court finds that NorthWestern has not met its burden of showing that the State's state law claims necessarily implicate any substantial federal issues, which means the third *Gunn* factor is not satisfied. Because the *Gunn* factors are conjunctive, the fact that the third factor is not satisfied means that "arising under" jurisdiction is lacking and the Court need not address the fourth and final *Gunn* factor.

### C.   <u>Federal Quiet Title Act</u>

NorthWestern argues the Federal Quiet Title Act ("the Act"), 28 U.S.C. § 2409a, provides an independent basis for federal question jurisdiction. The Act creates a cause of action "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a. Federal district courts have "exclusive original jurisdiction" over all civil actions arising under § 2409a. 28 U.S.C. § 1346(f). "Congress intended the [Act] to provide the exclusive means

-35-

by which adverse claimants could challenge the United States' title to real property." *Block v. N. Dakota ex rel. Board of University and School Lands*, 461 U.S. 273, 286 (1983).   Waivers of sovereign immunity are to be read narrowly and conditions on the waiver must be "strictly observed." *Block*, 461 U.S. at 287.

For a district court to exercise jurisdiction under the Act, two conditions must be met: "1) the United States must claim an interest in the property at issue; and 2) there must be a disputed title to real property between interests of the plaintiff and the United States." *Leisnoi, Inc. v. United States*, 267 F.3d 1019, 1023 (9th Cir. 2001) ("*Leisnoi II*").

1.   *"Claims an interest"*

To satisfy the first condition for initial jurisdiction under the Act, "the United States must claim an interest in the property at issue." *Leisnoi II*, 267 F.3d at 1023.  The interest claimed need not be in dispute, and need not be adverse to any party in the action.  *Leisnoi II*, 267 F.3d at 1023 (finding this condition was satisfied where the United States had an undisputed claim of an easement in the property at issue).

NorthWestern argues the United States has claimed an interest in the riverbeds at issue here by leasing them to Defendants and collecting annual rental charges.  That the United States has leased and collected rent on property that

-36-

includes all of the riverbeds still at issue here is not in dispute.  In its amicus

briefing to the United States Supreme Court, the United States explained that it

"owns riparian land throughout the Nation, including along the three rivers whose

navigability is at issue in his case," and that where those "waters were non-

navigable at the time of statehood, [it] has asserted its ownership of the riverbeds

in various ways, including by issuing patents, leases, and permits."  *PPL Montana,*

*LLC v. State of Montana*, Brief of United States as Amicus Curiae Supporting

Petitioner, 2011 WL 3947562 *1 (Sept. 7, 2011).  With respect to the riverbeds at

issue here, the United States explained that for the six dams not on the Great Falls

reach, Talen "pays annual rent charges of approximately $500,000 to $600,000"

and "a portion of [that] rent is for riverbed" use.  *Id.*\*34 n. 3.  The Supreme Court

recognized that Talen and its predecessor had been operating those power

facilities for decades without title-based objection by the State, and had been

paying rent to United States all that time.  *PPL Montana*, 132 S.Ct. at 1225.

NorthWestern also argues the United States claimed an interest in the

disputed riverbeds in a 1988 letter from the Bureau of Land Management ("BLM")

to the Montana Department of State Lands.  According to NorthWestern, BLM

contended in the letter that it owned land and subsurface minerals the State now

claims, and stated that it did "not agree with the [the State's] determination of the

navigability of these waterways."  (Doc. 94, at 31).

NorthWestern cites *Alaska v. United States*, 201 F.3d 1154, 1160 (9th Cir.

2000) for the proposition that the United States need not make a "formal assertion

of any claim to the rivers," and argues this evidence is enough to show that the

United States claims an interest in the disputed riverbeds.  In *Alaska*, the state of

Alaska brought suit against the United States to quiet title to three riverbeds on the

ground that the rivers were navigable at statehood.  *Alaska*, 201 F.3d at 1156.  The

United States refused to admit or deny the state's allegations that the rivers were

navigable at statehood, and refused to disclaim an interest in the property.  *Alaska*,

201 F.3d at 1159.  The United States argued that because it refused to take a

position in answer to the state's allegations, the riverbeds were not land in which it

"claimed an interest" and there was no jurisdiction under the Act.  *Alaska*, 201

F.3d at 1160.

The Ninth Circuit disagreed, and found that although the United States did

not claim an interest in the case at bar, it had previously claimed an interest in two

of the rivers during administrative proceedings in front of an administrative law

judge.  *Alaska*, 201 F.3d at 1160-61.  The United States had "in fact actively

asserted a claim of ownership" because the Bureau of Land Management

("BLM") took the position during those administrative proceedings that the two

-38-

rivers were not navigable at statehood.  *Alaska*, 201 F.3d at 1161.  The Ninth

Circuit held that "[o]nce the government has formally asserted a claim to an

interest in land, a state government is entitled to treat the land as 'real property in

which the United States claims an interest' regardless of whether the United States

has ceased actively to assert its claim."  *Alaska*, 201 F.3d at 1162.   Because "the

United States once actively claimed in litigation that it owned the riverbeds," the

Ninth Circuit concluded the "claims an interest" requirement of the Act was

satisfied for purposes of the two rivers.  *Alaska*, 201 F.3d at 1162.  As to the third

river, however, the Ninth Circuit found the United States had not claimed an

interest because it did not take any position during the administrative litigation.  It

was not until after the administrative proceedings had come to an end that the

BLM determined based on its own historical study that the third river was

navigable at statehood.  *Alaska*, 201 F.3d at 1159, 1164.

While *Alaska* makes clear that the United States need not have formally

claimed an interest in the riverbeds during this litigation, it must have done so at

some point for there to be jurisdiction under the Act.[7]  The 1988 BLM letter cited

---

[7] But see *Lesnoi I,* 170 F.3d at 1191.  In Lesnoi, patents by which the government conveyed the property at issue to the plaintiff expressly reserved to the United States several easements.  The Ninth Circuit held this was sufficient to show that the government claimed an interest in the property, notwithstanding the fact that the easements were not disputed by the plaintiff.

by NorthWestern is analogous to the BLM's determination in *Alaska* that the third river was navigable.  As such, it is not sufficient to establish that the United States "claims an interest" in the riverbeds.  Whether the fact that the United States has leased and collected rent on property that includes the disputed riverbeds constitutes a sufficient "claim of interest" is less clear.   But even assuming it does, NorthWestern has not shown that the second prerequisite for jurisdiction under the Act is satisfied.

2. *"Disputed title"*

To meet the second jurisdictional requirement, NorthWestern must show that there is a dispute over title to real property between the interests of the State and the United States.  *Leisnoi II*, 267 F.3d at 1023 (citing *Leisnoi, Inc. v. United States,* 170 F.3d 1188, 1192 (9th Cir. 1999) ("*Leisnoi I*")).  At first glance, it would appear this requirement is not met simply by virtue of the fact that the United States is not a party to this case and so has not asserted an adverse claim of title in answer to the State's complaint.  As NorthWestern points out, however, the Ninth Circuit has held that "a third party's claim of an interest of the United States can suffice to create a dispute in title if the third party's claim clouds the plaintiff's title." *Leisnoi II*, 267 F.3d at 1267.

NorthWestern argues it is just such a third-party.  As NorthWestern reads it,

*Leisnoi II* allows it to assert a property interest on behalf of the United States, thereby creating a dispute over title to the riverbeds and providing a basis for removal jurisdiction under the Act.  But NorthWestern's argument turns the Ninth Circuit's holding in *Leisnoi II* on its head.

The plaintiff in the *Leisnoi* litigation was an Alaska Native village corporation that wanted to sell land it had received by patent from the United States to the Exxon Valdez Oil Spill Trustees, but had not been able to do so because the Trustees were concerned that title to the land might revert to the United States.  *Leisnoi II*, 267 F.3d at 1021.  The Trustees' concern arose because a third party had recorded on behalf of the United States a notice of lis pendens covering the village's land.  *Leisnoi II*, 267 F.3d at 1021.  The village had successfully quieted title against the third party in state superior court, but the Trustees were still concerned that title might revert to the United States if it was later determined in pending federal administrative proceedings that the plaintiff did not qualify as a Native village.  *Leisnoi II*, 267 F.3d at 1021.

In an attempt to unequivocally remove the cloud on its title, the village filed suit in federal court against the United States under the Act.  *Leisnoi I*, 170 F.3d at 1191.  The district court dismissed the quiet title action for lack of subject matter jurisdiction, however, which meant it was unable to confirm the disclaimer of

interest filed by the United States disavowing any interest in the plaintiff's land. *Leisnoi I*, 170 F.3d at 1191.  The Ninth Circuit affirmed, holding that the second requirement for jurisdiction – that title between the plaintiff and the United States be disputed – had not been met at the time the complaint was filed.  *Leisnoi I,* 170 F.3d 1192.

The Ninth Circuit "reasoned that, although a third party's assertion that the United States has an adverse claim of title can create the requisite 'disputed title' to trigger jurisdiction under the Quiet Title Act, such a third-party claim can do so only if it clouds the plaintiff's title." *Leisnoi II*, 267 F.3d at 1022 (citing *Leisnoi I*, 170 F.3d at 1192)).  Because the village had successfully quieted title in state court and the third party's lis pendens was no longer in effect when the federal quiet title action was filed, the Ninth Circuit found there was no cloud on the plaintiff's title and no colorable dispute between the plaintiff's interests and those of the United States.  *Leisnoi I*, 170 F.3d at 1193.

Because the situation later changed dramatically, the Ninth Circuit reached a different conclusion in *Leisnoi II.*  By then, the Alaska Supreme Court had vacated the superior court's decision and directed that the third party's lis pendens remain in effect.  *Leisnoi II*, 267 F.3d at 1022.  The Ninth Circuit concluded that the third party's assertion of the United States' title interests, coupled with the

-42-

state court's decision allowing the third party's lis pendens to remain in place, was sufficient to create a colorable dispute between the plaintiff and the United States because it clouded title to the plaintiff's land. *Leisnoi II*, 267 F.3d at 1023-24.

Under *Leisnoi I* and *II,* a plaintiff can sue the United States to quiet title under the Act even if the United States does not actively assert its own adverse interest in the property, as long as a third party has claimed a property interest on behalf of the United States which places a cloud on the plaintiff's title. *See Public Lands Access Ass'n, Inc. v. Jones*, 176 P.3d 1005, 1009 (Mont. 2008). But that is not the situation here. For one thing, unlike the third party's lis pendens in *Lesnoi II*, NorthWestern's bare assertion of title on behalf of the United States does not place a cloud on the State's claim of title. Even more fundamentally, there was no suggestion in either of the *Leisnoi* decisions that a third party can do what NorthWestern is attempting to do here and alternatively invoke the Act as a jurisdictional basis for litigating a title dispute on behalf of the United States as against another party in federal court.

The Act was not designed to provide recourse for third parties like NorthWestern hoping to force the resolution of a title dispute between the United States and other parties. Rather, the Act provides recourse for "citizens asserting title to or the right to possession of lands claimed by the United States." *Block v.*

-43-

*North Dakota*, 461 U.S. 273, 282 (1983).  NorthWestern has no claim of title to or possession of the disputed riverbeds, and does not argue that it could invoke this Court's original jurisdiction by bringing an action to quiet title to the riverbeds either on behalf of the United States or against the United States in its own right. NorthWestern is without independent recourse under the Act, and the *Leisnoi* decisions do not allow it to invoke the Act as a basis for removal by claiming a property interest on behalf of United States.  Even if *Leisnoi I* and *II* could be read so broadly, NorthWestern's bare assertion of title on behalf of the United States does not place a cloud on the State's claim of title and is not sufficient to create a dispute over title for purposes of establishing jurisdiction under the Act.

The two other cases NorthWestern relies on in support of its argument that there is nonetheless a dispute over title between the United States and the State are distinguishable.  NorthWestern first cites *Calf Island Community Trust, Inc. v. Young Men's Christian Association of Greenwich*, 263 F.Supp.2d 400, 403 (D. Conn. 2003) for the proposition that the United States need not be a party to the litigation for there to be a dispute over title for purposes of establishing jurisdiction under the Act.

In *Calf Island*, the plaintiffs brought suit in state court to prevent one defendant, Young Men's Christian Association of Greenwich ("YMCA"), from

selling disputed property to the second defendant, Trust for Public Land ("TPL"), whose intent was to then convey the property to the United States. *Calf Island*, 263 F.Supp.2d at 401. The plaintiffs did not name the United States as a defendant, and their complaint referred to the United States as a "third party" without mentioning it by name. *Calf Island*, 263 F.Supp.2d at 401-02. However, by virtue of a recorded purchase agreement between the YMCA and TPL, it was not disputed that TPL would convey the property to the United States. *Calf Island*, 263 F.Supp.2d at 401.

The defendants invoked the artful pleading doctrine and removed the case on the ground that the federal court had jurisdiction under the Act because it involved a disputed title to real property in which the United States claimed an interest. *Calf Island*, 263 F.Supp.2d at 402. The court denied the plaintiffs subsequent motion to remand, concluding under the artful pleading doctrine that the United States did not have to be named as a party and the defendants permissibly claimed an interest in the property on behalf of the United States. *Calf Island*, 263 F.Supp.2d at 403. In reaching its conclusion, the court emphasized the fact that the plaintiffs "artfully" failed to state in the complaint that TPL had entered an agreement with the United States to convey the disputed property to the United States. *Calf Island*, 263 F.Supp.2d at 403.

Citing *Calf Island*, NorthWestern argues it can assert an interest in the riverbeds on behalf of the United States, and the United States need not be named as a party for this Court to have jurisdiction under the Act.  Significantly, however, in *Calf Island* the defendants YMCA and TPL presented competent proof of the fact that the United States claimed an interest in the property at issue. And the United States also asserted an adverse ownership interest in the property on its own behalf by initiating a condemnation action to take a fee simple interest the property, which was transferred to and consolidated with the plaintiffs' case in federal court.  *Calf Island*, 263 F.Supp.2d at 402.  There has been no such  claim by the United States in this case, and NorthWestern's bare assertion of title on behalf of the United States is not sufficient to create a dispute over title for purposes of establishing jurisdiction under the Act.

To the extent the *Calf Island* court premised its holding on the artful pleading doctrine, its reasoning is unpersuasive.  Under the artful pleading doctrine, a defendant may remove a case to federal court if the state law claims pled against it are in fact federal claims.  But the doctrine does not allow a defendant to do what NorthWestern is attempting here and remove a case on the ground that the state law claims pled against it are in fact federal claims that the State should have brought against a third party, i.e. the United States.

-46-

NorthWestern relies on *Hat Ranch, Inc. v. Babbitt*, 932 F.Supp. 1 (D.D.C. 1995) for the similar proposition that a party may not avoid exclusive federal jurisdiction under the Act by artfully pleading its claims.  But because *Hat Ranch* is materially distinguishable on procedural grounds, it is not persuasive.  In that case, several ranchers who had been using public lands for livestock grazing began receiving two bills for the same grazing rights from the United States and a New Mexico county.  *Hat Ranch*, 932 F.Supp. at 2.  Faced with duplicate bills, the ranchers paid the amount of one set of bills into the federal court's registry and initiated an interpleader action, joining the United States and the county as defendants.  *Hat Ranch*, 932 F.Supp. at 2. The county cross-complained against the United States seeking a declaration that it was entitled to the grazing fees, and the United States moved to dismiss for lack of subject matter jurisdiction.  The United States argued that the county's cross-complaint was really an action to quiet title under the Act, and because its claims fell outside the Act's twelve year limitations period there was no subject matter jurisdiction.  *Hat Ranch*, 932 F.Supp. at 2.

The court agreed on both points, noting that it would have to decide whether the county or the United States had title to the land before it could decide who was entitled assess and collect grazing fees.  *Hat Ranch*, 932 F.Supp. at 2.  The court

concluded that the county's cross-complaint against the United States was really an action to quiet title under the Act, but dismissed for lack of subject matter jurisdiction because the cross-complaint was not filed within the applicable limitations period. *Hat Ranch*, 932 F.Supp. at 2-3.

Analogizing to *Hat Ranch*, NorthWestern argues this case is really a quiet title action because the State must establish that it holds title to the riverbeds in order to prevail on its state law claims. But because the United States was a party to the *Hat Ranch* litigation, it made sense for the court to apply the artful pleading doctrine and conclude that the county's cross-claims against the United States were in fact claims to quiet title under the Act. Here, in contrast, the United States is not a party to the litigation. The artful pleading doctrine does not apply and NorthWestern's bare assertion of title on behalf of the United States is not enough to establish that there is a dispute over title to real property between the interests of the State and the United States.

For the reasons set forth above, the Court finds that NorthWestern has not met its burden of establishing that the two conditions necessary for the Court to exercise jurisdiction under the Federal Quiet Title Act are satisfied here. Because the Court is without subject matter jurisdiction under the Act, and NorthWestern has not met its burden of showing that "arising under" jurisdiction exists, this case

should be remanded to state court.

The Court recognizes that this result may leave the Defendants in something of a quandary.  As Talen explained in support of its petition for certiorari to the United States Supreme Court, because the United States maintained the Montana Supreme Court's decision that the State held title to the riverbeds was "both wrong and non-binding on the federal government," it continued charging rent for the same land the Montana courts had deemed state-owned.  *PPL Montana*, 2011 WL 2135023 *3.  While the United States "enjoy[ed] the cloak of sovereign immunity," Talen was being "doubly charged by the State and the federal government."   *PPL Montana*, 2011 WL 2135023 *3.  Even if Defendants prevail on the State's claims in state court, the United States may well stand by its position that it is not bound by the state court's decision because title to the riverbeds can only be adjudicated in a quiet title action under the Act.

Talen would thus be in the same position as the ranchers in *Hat Ranch*, who were being doubly charged by the county and the United States for the same grazing rights.  Presumably because the Act would not have conferred jurisdiction over a claim by the ranchers to quiet title in a dispute between the United States and the county, the ranchers filed an interpleader action to effectively bring the two entities into court and force litigation of the title issue.   Defendants might

well be able to do the same here, thereby bringing the United States to the table and forcing it to litigate title or disclaim an interest in the property.

## V.    **Conclusion**

For the reasons set forth above,

IT IS RECOMMENDED that the State's Objection and Motion to Dismiss Talen's Consent to Removal (Doc. 14)  be DENIED but its Motion to Remand (Doc. 12) be GRANTED.

DATED this 23rd  day of January, 2017

Jeremiah C. Lynch
United States Magistrate Judge