IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION


FILED
AUG 01 2018
Clerk, U.S District Court
District Of Montana
Missoula

| | |
|---|---|
| STATE OF MONTANA, <br><br> Plaintiff, <br><br> vs. <br><br> TALEN MONTANA, LLC, f/k/a PPL MONTANA, LLC, and NORTHWESTERN CORPORATION, d/b/a NorthWestern Energy, a Delaware Corporation, <br><br> Defendants. | CV 16–35–H–DLC <br><br><br> ORDER |

This case has followed a long course from its inception in 2003 to Defendants' pending motions to dismiss. On October 10, 2017, this Court determined that it has federal question jurisdiction under 28 U.S.C. § 1331. (Doc. 171 at 14.) Promptly following this decision, Defendants Talen Montana, LLC ("Talen") and NorthWestern Corporation ("NorthWestern") renewed their respective motions to dismiss, which had previously been denied as moot on January 24, 2017. At this juncture, Defendants contend that in *PPL Montana v. Montana*, 565 U.S. 576 (2012) (hereinafter "*PPL*"), the Supreme Court of the United States settled the issue of navigability for title of the Great Falls reach, effectively barring Plaintiff, the State of Montana ("Montana" or "the State"), from

-1-

seeking recovery for that section of the Missouri River. Montana opposes Defendants' motions, arguing that the Supreme Court issued an "open mandate" which merely established a new legal rule to be applied afresh in this case upon a more thoroughly developed factual record. Consequently, the Court must now determine whether the navigability of the entire Great Falls reach has been fully resolved. For the following reasons, the Court accepts as established that one section of the Great Falls reach, "from the head of the first waterfall to the foot of the last, is not navigable for purposes of riverbed title under the equal footing doctrine" and will dismiss Montana's claims as to rents owing from dams within that stretch. *PPL*, 565 U.S. at 599.

## BACKGROUND

In 2003, PPL Montana, LLC ("PPL"), was sued by parents of Montana schoolchildren in the Missoula division of this Court based upon diversity jurisdiction. The plaintiffs alleged that PPL was operating hydroelectric facilities on state-owned riverbeds and that the riverbeds were part of Montana's school trust lands which entitled plaintiffs to compensation for PPL's use of the property. The parents were dismissed for lack of standing after the State intervened as a party plaintiff. PPL then moved to dismiss the case for lack of subject matter

jurisdiction asserting that the State is not a citizen for purposes of diversity jurisdiction. The Court granted PPL's motion and dismissed the case.

In 2004, PPL filed suit in state court seeking a declaration that the State was not entitled to compensation for PPL's use of the riverbeds. The State counterclaimed seeking a declaration that it owned the riverbeds and was entitled to collect rent from PPL for their use. The trial court granted summary judgment to the State and ordered PPL to pay Montana $41 million in rent for its riverbed use between 2000 and 2007. The trial court found that the riverbeds of the Clark Fork, Missouri, and Madison rivers were navigable and accordingly held that the State owned the riverbeds through navigability for title under the Equal Footing Doctrine. The Montana Supreme Court affirmed the state district court in *PPL Montana, LLC v. State of Montana*, 229 P.3d 421, 443 (Mont. 2010), concluding the rivers were navigable as a matter of law at the time of statehood in 1889, meaning the State acquired title to the riverbeds at that time under the Equal Footing Doctrine.

PPL petitioned the United States Supreme Court for a writ of certiorari, which was granted on the issue of whether the Montana Supreme Court erred in its application of the navigability for title doctrine by applying a whole-river analysis. The Supreme Court reversed, holding, in relevant part, that the Montana Supreme

Court erred in disregarding the segment-by-segment approach to navigability for title. *PPL*, 565 U.S. at 593. The Montana Supreme Court erroneously found the "segment-by-segment approach . . . inapplicable [to the Great Falls reach] because it does not apply to 'short interruptions of navigability in a stream otherwise navigable." *Id.* at 596 (internal quotation marks and citations omitted). The United States Supreme Court explained that this was a mistake because the Court had not yet established that short interruptions should "merit treatment as part of a longer, navigable reach for purposes of title under the equal-footing doctrine," and, even if it had, the Great Falls reach "certainly would not" qualify as a "short interruption." *Id.* Further, the Court clarified that the Montana Supreme Court erred in its finding that portages are insufficient to defeat a finding of navigability—"[i]n most cases," portages logically defeat navigability because a portage, by necessity, requires "transportation over land rather than over the water." *Id.* at 597.

In the process of clarifying these principles, the Court applied them to the Great Falls reach, finding "no evidence" that this reach was navigable, stating that the need for a portage of this reach defeats a finding of navigability, and concluding that "the 17–mile Great Falls reach, at least from the head of the first waterfall to the foot of the last, is not navigable for purposes of riverbed title under

the equal-footing doctrine." *Id.* at 597–99. Thereafter, the Court remanded the case for the "ultimate decision" on the navigability of "the other disputed river stretches" to be "assessed in light of the principles discussed in [their] opinion." *Id.* at 600. It is the Supreme Court's analysis of the Great Falls reach which spurred the present controversy. Within the Great Falls reach are five hydroelectric facilities. Beginning upstream at Black Eagle Falls and continuing downstream, these dams are the Black Eagle Dam, the Rainbow Dam, the Cochrane Dam, the Ryan Dam (situated on the eponymous Great Falls), and the Morony Dam.

This case reached an eddy after the United States Supreme Court rendered its decision, during which time NorthWestern entered into a purchase and sale agreement for the acquisition of PPL's hydroelectric facilities in Montana, including the facilities at issue here. (Doc. 1-1 at 4.) The acquisition was approved by the Montana Public Service Commission in September 2014. (*Id.*) In June 2015, PPL Montana, LLC changed its legal name to Talen Montana, LLC. (Docs. 1-1 at 4; 13-3 at 2–3.)

The State and Talen stipulated in late March of 2016 that the State would be realigned as the Plaintiff and Talen would be realigned as the Defendant. (Doc. 13-3 at 3.) The parties also stipulated to bifurcate the issues of liability and

damages, with all claims or defenses relating to navigability at the time of statehood to be adjudicated first. (*Id.*) Six days later, on March 31, 2016, the State filed its complaint on remand in state court, naming both Talen and NorthWestern as Defendants. (Doc. 13-4.) The State asks for a declaration that it owns the land occupied by Defendants' hydroelectric facilities and seeks to recover rental payments for these lands, including a claim for the five dams along the Great Falls reach.

On April 20, 2016, NorthWestern filed a notice of removal invoking this Court's federal question jurisdiction. (Doc. 1.) Talen consented in writing to the removal. (Doc. 1-3.) The State moved to remand the case back to state court, arguing that mere application of federal law did not mean that the case arose under federal law for purposes of federal question jurisdiction and that state law governed "equal footing lands." (Doc. 160 at 11 (internal quotation marks omitted).) As previously mentioned, this Court determined that federal question jurisdiction existed because the vindication of the State's claims necessarily turned upon the construction of federal law. (Doc. 171 at 14.) Accordingly, the State's request for remand was denied.

On October 16, 2017, Defendants renewed their motions to dismiss, asserting that the decision of the Supreme Court precludes relitigation of the

navigability of the Great Falls reach. Talen argues that the mandate rule allows this Court to dismiss the State's claims regarding the Great Falls reach because navigability of this segment of the river should be considered as disposed of and finally settled by the Supreme Court. (Doc. 5 at 10.) NorthWestern joins in Talen's argument and further asserts that, as a nonparty in a subsequent suit, NorthWestern is entitled to invoke the Supreme Court's decision to dismiss Montana's claims against it. (Doc. 7 at 5.) A hearing on Defendants' motions was held on May 25, 2018.

## DISCUSSION

Defendants have moved for dismissal of the State's claim pertaining to the Great Falls reach pursuant to Federal Rule of Civil Procedure 12(b)(6) and the mandate rule. (Docs. 4 at 1; 6 at 2.) Dismissal under Rule 12(b)(6) is "proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013). Unfortunately, Defendants have not explained how Rule 12(b)(6) relates to the mandate rule. Despite invoking Rule 12(b)(6), Defendants proceed to assert their case for dismissal upon a theory that the mandate rule deprives this Court of the authority to render a decision regarding the Great Falls reach—implying that this Court lacks subject-matter jurisdiction, a contention

which has already been litigated in this case (as condensed above) and which would be appropriately filed as a Rule 12(b)(1) motion. Nonetheless, the Court proceeds with the analysis satisfied that dismissal under Rule 12(b)(6) is appropriate where "the plaintiff 'cannot possibly win relief.'" *Reed v. Lieurance*, 863 F.3d 1196, 1207 (9th Cir. 2017) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 683 n. 7 (2001)). If the mandate rule supports the contention that this Court cannot consider the navigability for title of the Great Falls reach, then Montana "cannot possibly win relief" on its claims to that stretch of the river and those claims will be dismissed.

### A. The mandate rule

The law of the case doctrine, which includes the mandate rule, has "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 856 (3d Cir. 1994). "At an early date (1838) the Supreme Court announced [the mandate] rule which has never been abandoned." *Fed. Home Loan Bank of San Francisco v. Hall*, 225 F.2d 349, 394 n. 10 (9th Cir. 1955); *see also Casey* 14 F.3d at 857 ("A recent statement of the rule by this court shows that the rule has remained essentially unchanged in nearly one hundred fifty years."). As originally enunciated, the mandate rule established:

> Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; nor give any other or further relief; nor review it upon any matter decided on appeal, for error apparent; nor intermeddle with it, further than to settle so much as has been remanded.

*Sibbald v. United States*, 37 U.S. 488, 492 (1838). The mandate rule has been described as "similar to, but broader than, the law of the case doctrine." *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995). Although the two doctrines overlap, "they are not identical," while both "serve an interest in consistency, finality and efficiency, the mandate rule also serves an interest in preserving the hierarchical structure of the court system." *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2007).

The "fundamental" mandate rule "binds every court to honor the rulings in the case by superior courts," ensuring "careful observation of the allocation of authority established by the three-tier system of federal courts which is necessary for a properly functioning judiciary." *Casey*, 14 F.3d at 856–57 (internal quotation marks omitted). This limit of authority is reflected by the Ninth Circuit's finding that "if a district court errs by violating the rule of mandate, the error is a jurisdictional one." *Thrasher*, 483 F.3d at 982. On remand, a district court is "without power to do anything . . . contrary to either the letter or spirit of the mandate *construed in the light of the opinion of [the superior] court deciding the*

*case.*" *Colville Confederated Tribes v. Walton*, 752 F.2d 397, 400 (9th Cir. 1985) (quoting *Firth v. United States*, 554 F.2d 990, 994 n. 3 (9th Cir. 1977)) (emphasis in original). Because a lower court is limited to considering only those issues "not expressly or impliedly disposed of on appeal," *Vizcaino v. U.S. Dist. Ct.*, 173 F.3d 713, 719 (9th Cir. 1999) (quoting *Firth*, 554 F.2d at 993), it is necessary to "look to the language of the Supreme Court's opinion to see what it intended in this case," *Casey*, 14 F.3d at 857.

### B. The Supreme Court's decision in *PPL*

The Supreme Court in *PPL* determined that the "primary flaw in the reasoning of the Montana Supreme Court lies in its treatment of the question of river segments and overland portage." *PPL*, 565 U.S. at 593. In discussing the errors attributable to the Montana Supreme Court on both of these questions, the Court found that application of the correct principles to the Missouri River "provides an excellent example." *Id.* at 595.

Turning first to the application of segmentation, the Court explained that the "segment-by-segment approach to navigability for title is well settled" and "must be sensibly applied." *PPL*, 565 U.S. at 594, 596. The Court reasoned that, even if the law did recognize that some segments of unnavigable river warranted treatment as part of a longer, navigable reach, "the kinds of considerations that would define

-10-

a *de minimis* exception to the segment-by-segment approach would be those related to principles of ownership and title, such as inadministrability of parcels of exceedingly small size, or worthlessness of the parcels due to overdivision." *Id.* at 596. The Court then stated that these considerations are "best illustrated by the Great Falls reach, which is 17 miles long and has distinct drops including five waterfalls and continuous rapids in between." *Id.* at 597. The Court explained that the falls made navigability doubtful but, nonetheless, the segment was not so small as to render title worthless or inadministrable. Indeed, the segment could not be ignored when the $41 million award represented rents owed for facilities of which half "are along the Great Falls reach." *Id.*

Next, the Court elucidated why portages were particularly capable of defeating a finding of navigability, relying predominantly upon the recorded portage of the Great Falls reach by Meriwether Lewis and William Clark during their "remarkable expedition through the American West in 1805." *Id.* at 583, 597–99. Noting the Lewis and Clark portage and "applying its 'short interruptions' approach," the Montana Supreme Court had erroneously "decided that the Great Falls reach was navigable because it could be managed by way of land route portage." *Id.* (quoting *PPL Montana, LLC v. Montana*, 229 P.3d 421, 447, 449 (Mont. 2010)). Yet the Lewis and Clark portage of the Great Falls reach

-11-

demonstrated the problem with the Montana Supreme Court's analysis. Watching buffalo "in considerable quantities" being swept over the falls and "instantly crushed," Lewis could see that "their steep cliffs and swift waters would impede progress on the river" and opted for an 18–mile portage which took roughly 11 days to complete. *Id.* at 583, 585, 597 (internal quotation marks and citations omitted). The Court explained that "[e]ven if portage were to take travelers only one day, its significance is the same: it demonstrates the need to bypass the river segment, all because that part of the river is nonnavigable." *Id.* at 597. Finally,

> [h]aving clarified that portages may defeat navigability for title purposes, *and do so with respect to the Great Falls reach*, the Court sees no evidence in the record that could demonstrate that the Great Falls reach was navigable. Montana does not dispute that overland portage was necessary to traverse that reach. Indeed, the State admits "the falls themselves were not passable by boat at statehood." And the trial court noted the falls had never been navigated. Based on these statements, this Court now concludes, contrary to the Montana Supreme Court's decision, that the 17–mile Great Falls reach, at least from the head of the first waterfall to the foot of the last, is not navigable for purposes of riverbed title under the equal-footing doctrine.

*Id.* at 599 (internal citations omitted).

After making this conclusion regarding the Great Falls reach, the Court discussed the evidence regarding PPL's Thompson Falls facility on the Clark Fork River, from which Montana also seeks rents, and determined "that there is a significant likelihood" that this section of the river would "also fail the federal test

-12-

of navigability for the purposes of determining title." *Id.* Nonetheless, the Court refrained from making a specific finding as to the Thompson Falls, instead stating that "[w]hile the ultimate decision as to this and the other disputed river stretches is to be determined, in the first instance, by the Montana courts upon remand, the relevant evidence should be assessed in light of the principles discussed in this opinion." *Id.* at 600.

### C. The Scope of the Mandate

The opinion of the Supreme Court makes clear its intent. In some cases, when the Supreme Court "adopts a new legal standard," it will explicitly remand the case "for the courts below to apply the new standard in the first instance," but in other cases, "it applies the new standard itself and decides the merits." *Casey*, 14 F.3d at 857 (internal citations omitted). Here, the Court appears to have taken a combined approach. Although the Court was not adopting a "new legal standard," the Court certainly deemed thorough clarification of an existing legal standard necessary and applied the standard itself to a segment of river in dispute that was both indisputably portaged and admittedly not passable by boat at statehood. The Court then passed on the application of the articulated principles to the remaining segments in dispute for application "upon remand." With such a clear directive,

-13-

this Court is wary of allowing this litigation to proceed on a course seeming both unanticipated and opposite to that intended by the Supreme Court.

The State contends that the mandate rule does not dictate dismissal of its claims for the Great Falls reach—arguing that the applicability of the mandate in this case directed only to reversal of the grant of summary judgment on navigability and nothing more. (Doc. 177 at 20–25.) Montana puts much emphasis on the mandate being "open" rather than "limited," asserting that when a mandate is open, it allows courts "to consider or reconsider all issues consistent with the general mandate affirming, reversing, or vacating the judgment below." (*Id.* at 17.) Montana stresses that, in this case, because the mandate is open, the Court may reconsider the navigability of the entire Great Falls reach because that is consistent with the general mandate of reversal of summary judgment.

Montana's argument is unconvincing. It is true that the Ninth Circuit has established that "a district court is limited by this court's remand in situations where the scope of the remand is clear." *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006). In such cases, where the mandate remands the case for specific proceedings or compliance with a specific instruction, the Court is obligated to "faithfully carry out [the] command and go no further." *Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activities*,

518 F.3d 1013, 1018 (9th Cir. 2008). However, merely because "additional issues [are] not open for review" when there is a limited mandate, *Thrasher*, 483 F.3d at 983 (internal quotation marks and citation omitted), does not mean that when a mandate is open, the Court may reanalyze issues decided on appeal so long as the issue does not erode the "general mandate affirming, reversing, or vacating the judgment below," as the State suggests, (Doc. 177 at 17).

The Court is free to "make any order or direction in further progress of the case, *not inconsistent with the decision of the appellate court*," and "may consider, *as a matter of first impression*, those issues not expressly or implicitly disposed of by the appellate decision." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 950 (3d Cir. 1985) (citing *Quern v. Jordan*, 440 U.S. 332, 347 n. 18 (1979), and compiling cases). "There is ample precedent" to sustain the principle that the opinion of the appellate court "is to be consulted to ascertain what was intended by its mandate and that questions considered and decided in the opinion of the court are not to be reexamined in any subsequent stage of the same case." *Fed. Home Loan*, 225 F.2d at 370 n. 10 (compiling cases). Here, it is beyond dispute that the Supreme Court analyzed the navigability of the Great Falls reach and made a conclusive decision as to that issue. It would be inappropriate for this Court to decry the nonnavigability of the Great Falls reach in the wake of the Supreme

Court's disposition of the issue. Accordingly, the Court is convinced that the mandate is not "open" as regards reanalysis of the Great Falls reach, "at least from the head of the first waterfall to the foot of the last."[1] *PPL*, 565 U.S. at 599.

The State next argues that the Supreme Court could not have decided that the Great Falls reach was nonnavigable for purposes of title because the State was not faced with a cross-motion for summary judgment on the issue. (Doc. 177 at 20–25.) The State contends that it "'would be inappropriate for [the court] to reverse the trial court on the basis of facts not incorporated in the record which the trial court considered at the time of its decision.'" (*Id.* at 24 (quoting *Creamette Company v. Merlino*, 289 F.2d 569, 570 (9th Cir. 1961)).) However, it must be remembered that the Supreme Court was faced with a state court decision granting Montana summary judgment regarding navigability for title to the Great Falls reach. There were facts incorporated in the record which made the navigability of the Great Falls reach undisputed. Based upon Montana's concessions that "a portage was necessary," and "the falls themselves were not passable by boat at statehood," as well as the trial court's statement that "the falls had never been navigated," the Court concluded, "*contrary to the Montana Supreme Court's*

---

[1] Having so concluded, the Court will not address the State's argument that this portion of the *PPL* decision was mere dicta. As Talen points out, "statements 'made casually and without analysis'" are considered dicta. (Doc. 181 at 11 (quoting *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001)).) Assuredly, the discussion of the Great Falls reach in *PPL* cannot be defined as such.

-16-

*decision*, that the 17–mile Great Falls reach, at least from the head of the first waterfall to the foot of the last, is not navigable for purposes of riverbed title under the equal-footing doctrine." *PPL*, 565 U.S. at 599 (internal quotation marks and citations omitted) (emphasis added). The Court's conclusion is consistent with its statutory power to enter "such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. The Court is satisfied that the United States Supreme Court had the authority to decide the navigability of the Great Falls reach.

### D. The Extent of the Great Falls Reach

Montana's most persuasive argument is that the conclusion of the Supreme Court is ambiguous because it contains the statement "at least from the head of the first waterfall to the foot of the last." (Doc. 177 at 13–15.) Despite this Court's conclusions that the mandate is not open regarding the Great Falls reach and that the Supreme Court had the authority to decide the issue, the opinion does not precisely define the Great Falls reach. To be sure, the language emphasized by the State makes it apparent that the Court hedged its definition of the Great Falls reach.

At most, the entire 17–mile stretch is included. At least, the section beginning at the head of Black Eagle Falls to the foot of the Great Falls is not navigable. This ambiguity is concerning to the Court. Particularly in light of the

-17-

expert reports which are contained in the record and which clearly raise some issues of fact regarding the navigability of certain sections contained within the broadest reading of the 17–mile reach. Nonetheless, the ambiguity does not render the mandate entirely impotent in regards to the Great Falls reach. The Supreme Court's caveat within its conclusion denotes the low-water mark going forward. The Court is confident that the section demarcated by the head of Black Eagle Falls and the foot of the Great Falls has been definitively excepted from any further analysis of navigability for title.[2]

Additionally, it is worth noting that not even the matter of what constitutes the 17–mile stretch is beyond dispute. Talen presently asserts that the 17–mile stretch extends from Broadwater Bay at river-mile 534 to the "last rapid just past Belt Creek at river-mile 517." (Doc. 181 at 15.) But Belt Creek (formerly known as "Portage Creek") is at river-mile 517.7; 534 less 517.7 is 16.3 miles, not 17 miles. (Doc. 181-8 at 2.) Interestingly, when before the Supreme Court, Montana asserted that the "17 miles that has been used in this case to refer to the Great Falls is generally demarked by the confluence with Belt (Portage) Creek, several miles below Great Falls, and Sun (Medicine) River, several miles above Black Eagle

---

[2] It would defy common sense, and the mandate rule, to entertain argument regarding the navigability of rapids between the falls since many "difficult, shelf-like rapids formed at horizontal ledges of sandstone lay in the channel between the falls, and on below [Great] Falls, making a single portage more desirable." (Doc. 106-14 at 46; 188.)

-18-

Falls." Brief for Respondent, *PPL Montana, LLC v. Montana*, 2011 WL 5126226, at *10 (Oct. 27, 2011). However, the confluence of the Missouri River and Sun River is at river-mile 535; 535 less 517.7 is 17.3 miles. (Doc. 181-8 at 2.) To complicate this issue, the Supreme Court did not specifically define the 17–mile stretch to which it referred. Instead, the Court vaguely stated that the "17–mile stretch . . . begins somewhat above the head of Black Eagle Falls," and does not provide a definitive end point. *PPL*, 565 U.S. at 584. This ambiguity serves to bolster the Court's determination that the mandate should only pertain to the caveat explicitly carved into the Supreme Court's conclusion regarding the Great Falls reach.

Based on the foregoing, the Court finds that the Supreme Court's mandate bars litigation of the navigability for title of the roughly 8.2 river-mile stretch demarcated as the head of the Black Eagle Falls to the foot of the Great Falls. (Doc. 181-8 at 2.) Consequently, Plaintiff "lack[ ] a cognizable legal theory," *Zixiang Li*, 710 F.3d at 999, and "cannot possibly win relief" with regard to their claims pertaining to the riverbed between Black Eagle Falls and the Great Falls, *Reed*, 863 F.3d at 1207. Accordingly, the Court will dismiss Plaintiff's claims pertaining to this section of the Missouri River.

Lastly, the Court is satisfied that the effect of the mandate applies with equal force to the State's claims against NorthWestern. As NorthWestern notes, the "Equal Footing Doctrine applies to all parties equally." (Doc. 182 at 5.) Because the State did not acquire title to the riverbed between Black Eagle Falls and the Great Falls, the State cannot possibly win relief on its claims for rent derived from use of that specific section of the Missouri River riverbed.

IT IS ORDERED that the Defendants' Motions (Docs. 173; 174) are GRANTED IN PART. Counts I, II, and III of Plaintiff's Complaint on Remand (Doc. 1-1) are DISMISSED to the extent that they pertain to approximately 8.2 miles of the riverbed of the Missouri River between Black Eagle Falls and the Great Falls for failure to state a claim upon which relief can be granted.

IT IS FURTHER ORDERED that Defendants shall file their answers by August 22, 2018. Thereafter, the Court will set a preliminary pretrial conference.

DATED this 1st day of August, 2018.

Dana L. Christensen, Chief District Judge
United States District Court