IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| STATE OF MONTANA, | CV 16–35–H–DLC |
| Plaintiff, | |
| vs. | ORDER |
| TALEN MONTANA, LLC, f/k/a PPL Montana, LLC, and NORTHWESTERN CORPORATION, d/b/a NorthWestern Energy, a Delaware corporation, and UNITED STATES OF AMERICA, United States Forest Service, United States Bureau of Reclamation, and United States Bureau of Land Management, | |
| Defendants. | |

Before the Court are two motions for partial summary judgment and several motions in limine.  (Docs. 255, 260, 276, 279, 282, 287, 290, 291.)  The Court will address each motion in turn.

## FACTUAL AND PROCEDURAL BACKGROUND

The long procedural history of this case is summarized in this Court's order granting in part Defendants' motions to dismiss.  *Montana v. Talen Montana, LLC*, No. CV 16-35-H-DLC, 2018 WL 3649606, at *1–3 (D. Mont. Aug. 1, 2018).  The operative complaint alleges that Defendants Talen Montana, LLC ("Talen") and NorthWestern Corporation ("NorthWestern") occupy land owned by the State of

1

Montana, and Talen and NorthWestern owe the state compensation for their past and current occupation of that land. (Doc. 221.) The United States was joined as a necessary party because it asserts ownership of the land in question and charges rent to NorthWestern for its use. (Doc. 216.) Montana alleges ownership of submerged lands underlying certain segments of the Madison, Missouri, and Clark Fork Rivers under the Equal-Footing Doctrine. (Doc. 221 at ¶¶ 40–41, 63–81.) Montana seeks declaratory judgment that it owns the land in question, compensation or restitution for Talen and NorthWestern's past and present occupation and use of the land, and an order quieting title to the land. (*Id.* ¶¶ 94–114.)

## LEGAL STANDARD

Under the Equal-Footing Doctrine, "[u]pon statehood, the State gains title within its borders to the beds of waters then navigable[.]" *PPL Montana, LLC v. Montana*, 565 U.S. 576, 591 (2012). Rivers are navigable if they "are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Id.* at 592 (quoting *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1871)). The navigability of waters for purposes of state title "is determined at the time of statehood . . . and based on the natural and ordinary condition of the water[.]" *Id.*

at 592 (internal quotation omitted).  Navigability for title is distinct from

navigability determinations in the context of admiralty jurisdiction (which extends

to water routes made navigable even if not formerly so), federal regulatory

authority (which extends to newly navigable waters, formerly navigable waters,

and waters that may become navigable with reasonable improvements), and the

federal commerce power (which focuses on navigation involving interstate

commerce).  *Id.* at 592–93.

   "To determine title to a riverbed under the equal-footing doctrine," the Court

"considers the river on a segment-by-segment basis to assess whether the segment

of the river, under which the riverbed in dispute lies, is navigable or not."  *Id.* at

593.  The Supreme Court has "noted the importance of determining 'the exact

point at which navigability may be deemed to end.'"  *Id.* at 594 (quoting *United

States v. Utah*, 283 U.S. 64, 77 (1931)).  A segment should be "discrete, as defined

by physical features characteristic of navigability or nonnavigability, and

substantial, as a matter of administrability for title purposes."  *Id.* at 597.  "[S]hifts

in physical conditions" of a river "provide a means to determine appropriate start

points and end points for the segment in question," and "[t]opographical and

geographical indicators" such as gradient changes or the location of a tributary

providing additional flow "may assist."  *Id.* at 595.  Substantiality requires

consideration of factors "related to principles of ownership and title, such as

inadministrability of parcels of exceedingly small size, or worthlessness of the parcels due to overdivision." *Id.* at 596.

In determining navigability for title, "the evidence must be confined to that which shows the river could sustain the kinds of commercial use that, as a realistic matter, might have occurred at the time of statehood." *Id.* at 600. "The evidence of the actual use of streams, and especially of extensive and continued use for commercial purposes may be most persuasive," but actual use is not the only permissible evidence. *Utah*, 283 U.S. at 82. "[W]here conditions of exploration and settlement explain the infrequency or limited nature" of actual commercial use of a body of water, "the susceptibility to use as a highway of commerce may still be satisfactorily proved." *Id.* Relevant evidence may include "physical characteristics and experimentation as well as by the uses to which streams have been put." *Id.* at 83. However, "[m]ere use by initial explorers or trappers, who may have dragged their boats in or alongside the river despite its nonnavigability in order to avoid getting lost, or to provide water for their horses and themselves, is not itself enough" to prove navigability. *PPL*, 565 U.S. at 600. Likewise, recreational use of a river and "poststatehood evidence, depending on its nature, may show susceptibility of use at the time of statehood." *Id.* at 600–01. But a party "seeking to use present-day evidence for title purposes must show: (1) the watercraft are meaningfully similar to those in customary use for trade and travel at

the time of statehood; and (2) the river's poststatehood condition is not materially different from its physical condition at statehood." *Id.* at 601.  Evidence that a river segment required a portage may be sufficient to defeat a finding of navigability because "[i]t demonstrates the need to bypass the river segment, all because that part of the river is nonnavigable." *Id.* at 597.

## I.     Motions for Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Accordingly, only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 247–48.

Summary judgment is inappropriate where the parties genuinely dispute a material fact: "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The court must view the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, a party opposing a "properly supported motion for summary judgment

may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

    **a. Talen's Motion for Partial Summary Judgment Regarding Bear Trap Canyon**

       Talen moves for partial summary judgment on Montana's claims concerning the Bear Trap Canyon, which it describes as a "sub-segment" of the Madison River.  (Doc. 255; Doc. 256 at 2.)[1]  Montana claims that the "segments of the Madison River on which the Madison Hydropower Developments are located . . . were navigable for title at the time of statehood."  (Doc. 221 at ¶ 78.)  Although the parties appear to disagree about the precise river mile boundaries of the land surrounding the Madison Hydropower Developments to which Montana is asserting title, they do not dispute that part of Bear Trap Canyon lies within those boundaries.  Talen contends that there is no genuine dispute of material fact concerning the non-navigability of Bear Trap Canyon, which the parties agree runs from River Mile 33 to 42.5.  (Doc. 256 at 4–5; Doc. 271 at 3.)   Talen argues that none of Montana's expert witnesses opined that Bear Trap Canyon is navigable for title, while Talen's experts have opined that it was non-navigable based on its

---

[1]  Although Montana's expert geomorphologist testified that Bear Trap Canyon is more properly considered a separate segment, the Court agrees with the parties that this distinction need not be resolved for purposes of this motion for partial summary judgment.  (Doc. 270 at 7 n.1.)

physical characteristics. (Doc. 256 at 6–8.) NorthWestern and the United States

joined in Talen's motion. (Docs. 259, 266.)

Montana responds by arguing that it has produced "ample evidence" that

Bear Trap Canyon was navigable at statehood because it was "susceptible of being

used" as a highway of commerce. (Doc. 270 at 13.) In particular, Montana argues

that numerous factual disputes—including the customary modes of trade and travel

on water at the time of Montana's statehood, the natural condition of the Madison

River at or near statehood, and whether watercraft smaller than steamboats could

navigate the canyon—underlie the ultimate question of Bear Trap Canyon's

navigability for title. (*Id.* at 14–25.)

In reply, Talen contends that the factual disputes raised in Montana's reply

brief are immaterial to the question of Bear Trap Canyon's navigability for title.

(Doc. 296 at 8–16.)

Viewing the evidence in the light most favorable to Montana as the non-

moving party, the Court concludes that Montana has set forth sufficient facts to

demonstrate that there is a genuine dispute of material fact concerning the

navigability for title of Bear Trap Canyon. Specifically, Montana has produced

evidence to support a finding that Bear Trap Canyon was susceptible of being used

as a highway for commerce at statehood. The following discussion of particular

factual disputes is exemplary only and not intended to convey that other issues of fact are not in dispute.

First, there is a material factual dispute concerning the customary mode of trade and travel on rivers at the time of Montana's statehood.  Defendants have presented evidence that the upland steamboat was the customary mode of trade and travel at the time of Montana's statehood, and Bear Trap Canyon's "steep, fast, bouldery reaches" were "complete obstructions to commercial navigation."  (Doc. 258-7 at 8–10.)  Jason Cajune, Montana's expert on watercraft, reported that "[i]t is unlikely any steamboat was ever used on the Madison river[,]" but bateaus— flat-bottomed vessels between 12 and 50 feet long and "close kin to a dory"—were used on the east coast by traders, trappers, and for transportation before 1889 and were used as utility boats for log drives in the west, and "would be expected to navigate up to Class IV rapids if present on the . . . Madison[.]"  (Doc. 273-1 at 15–17.)  He explained that bateaus' flat-bottomed design gives them higher weight capacities than round-bilged boats and allows them to "float higher, avoiding rocks and making them very maneuverable."  (*Id.* at 16.)  Another expert historian, Theodore Karamanski, provided a rebuttal report that recounted historical reports of bateaus being used to transport goods and people on western rivers during a gold rush in Idaho in 1884; he also described the use of bateaus to transport people and rafts to transport supplies during log drives near the time of Montana's

8

statehood.  (Doc. 273-5 at 9, 11–15.)  Viewed in the light most favorable to

Montana, the evidence before the Court is sufficient for a reasonable factfinder to

conclude that bateaus were a customary mode of trade and travel on rivers at the

time of Montana's statehood.

Second, there is a material factual dispute whether boats constituting the

customary mode of trade and travel could have navigated Bear Trap Canyon at

statehood.  As discussed above, relevant evidence may include physical

characteristics of the waterway, experimentation, the uses to which the waterway

has been put, and post-statehood evidence of use (so long as the watercraft are not

meaningfully different from those in use at statehood and the waterway has not

materially changed since statehood).  *PPL*, 565 U.S. at 601; *Utah*, 283 U.S. at 82–

83.  Montana has introduced sufficient evidence in these categories to survive a

motion for summary judgment.

Defendants' experts contend that construction and operation of the Madison

Dam since 1906 has materially altered the flows within Bear Trap Canyon, and

flows have increased during the "navigation season" of July to October, "which

would tend to make the canyon segment more navigable than at the time of

statehood."  (Doc. 258-7 at 28–30; *see also id.* at 34–35 (explaining that the

Madison Project reduced peak flows and increased flows over the navigation and

winter seasons).)  These experts opine that prior conditions, including significant

talus and rockfall in the channel, likely would have required a portage of about 15 miles.  (*Id.* at 30.)  They report that Bear Trap Canyon had a gradient of 20.6 feet per mile and "contains a number of Class III, IV, and V rapids" according to American Whitewater, but they later clarify that American Whitewater "rates the canyon as boatable with Class 1-IV/V rapids (depending on the flow)[.]"  (*Id.* at 13–14, 30.)  They emphasize that eight rafters have died in Bear Trap Canyon, and commercial rafters do not run the river when its flows are higher than 3200 cfs, "which is about half the 2-yr peak flow that has a 50% probability of occurring in any given year."  (*Id.* at 27.)  They do not, however, contend that this occurs with such frequency that this fact alone renders the river reach non-navigable.  *See PPL*, 565 U.S. at 602–03 ("[A] river need not be susceptible of navigation at every point during the year, [but] neither can that susceptibility be so brief that it is not a commercial reality.").

By contrast, Montana's geomorphology experts, Andrew Wilcox and John Schmidt, stated that "[t]he bouldery channel in Bear Trap Canyon is successfully navigated by modern boats" and opined that "[t]he channel in the Lower Canyons[,]" in which Bear Trap Canyon lies, "has changed little since statehood." (Doc. 273-2 at 3, 5.)  They further assessed data relating to the flow of the Madison River, opining that "[t]oday, the magnitude of typical flows of the Madison River downstream from Ennis Lake that occur ~9 mths/yr are approximately the same as

10

at the turn of the 20th century[.]" (*Id.* at 7.)  Jason Cajune reported that there is "only one Class V+ rapid in Montana[,] which is called Jaws on the Middle Fork of the Flathead River[,]" which, viewed in the light most favorable to Montana, supports an inference that bateaus, which he opined could navigate up to Class IV rapids, could navigate the rapids in Bear Trap Canyon.  (Doc. 273-1 at 9, 17.)  He further opined that dories are modern watercraft that "are in use on all three of the rivers in question" including the Madison, they "regularly descend up to Class IV rapids[,]" and they are similar in several respects to bateaus in existence at the time of statehood.  (*Id.* at 18–20.)  A reasonable factfinder could conclude based on this evidence, viewed in the light most favorable to Montana, that Bear Trap Canyon was navigable by bateaus at the time of statehood; together with a finding that bateaus were a customary mode of trade and travel at the time of statehood, these would be sufficient to support a finding that Bear Trap Canyon was susceptible of navigation at statehood.

These factual disputes concerning the customary mode of trade and travel and the ability of particular watercraft to navigate the Bear Trap Canyon at the time of Montana's statehood are essential to the ultimate navigability determination, and they preclude partial summary judgment concerning the navigability of Bear Trap Canyon.  Accordingly, Defendants' motion for partial

summary judgment concerning the navigability of Bear Trap Canyon (Doc. 255) will be denied.

**b.  Talen's Motion for Partial Summary Judgment Regarding Clark Fork River Segments**

Talen moves for partial summary judgment in its favor on Montana's claims seeking recovery for the disputed reach on the Clark Fork River, which includes the Thompson Falls and Eddy Segments.  (Doc. 260.)  The parties agree that the Thompson Falls Segment runs from River Mile 207.1 to 208.1.  (Doc. 274 at 2.)  The parties dispute the precise boundaries of the Eddy Segment; Montana's experts assert that it runs from River Mile 208.1 to 232, while Talen's experts assert that it runs from River Mile 208.1 to River Mile 235.5.  (*Id.* at 2–3.)  Montana's claim of title extends from River Mile 207.4 to 220.1.  (*Id.* at 2.)

Talen argues that the State has conceded that the Thompson Falls Segment fails the navigability for title test, and a 1910 district court decree holding that the river section in which the Thompson Falls Project would be constructed was not navigable for title has preclusive effect as to the Eddy Segment (hereinafter the "1910 Decree").  (Doc. 261 at 1–2.)  NorthWestern joined in the motion (Doc. 263), and the United States adopted the motion, concurred in its arguments, and adopted its accompanying statement of undisputed facts (Doc. 266).  Montana

responds that it has introduced evidence that the Thompson Falls and Eddy Segments are navigable, and the 1910 Decree has no preclusive effect. (Doc. 272.)

### 1.     Navigability of the Thompson Falls and Eddy Segments

Talen contends that the Supreme Court "took the Montana state courts to task for dismissing" the 1910 Decree as conclusory and ruled that the federal judgment and the 1891 Army Corps of Engineers Report on which it relied were relevant evidence that the Thompson Falls reach was non-navigable for title. (Doc. 261 at 12 (citing *PPL*, 565 U.S. at 599–600, 602).) Talen argues that Montana's expert historian, Dr. Douglas Littlefield, repeated that error and did not consider the decision or report, and Montana provided no evidence of actual navigation of the Eddy Segment. (*Id.* at 12–13.)

Montana responds that Dr. Littlefield concluded that the Eddy Segment was actually navigated and was susceptible of navigation based on historical photographs and the opinions of land surveyors; small watercraft navigated the Clark Fork River upstream from Thompson Falls; and log drives were conducted on the Clark Fork River near the time of statehood, beginning above Thompson Falls and continuing downriver. (Doc. 272 at 15–16.) Montana further cites federal regulatory proceedings in which the Federal Power Commission concluded that the Clark Fork River was navigable based on findings that the river was used for transportation of people and property in Oregon, Idaho, and Montana. (*Id.* at

13

16–18.)  The State concedes that Thompson Falls "constituted an obstacle to some

forms of navigation[,]" but log floats occurred within the Thompson Falls

Segment, and only approximately 1100 feet of the Segment would have a steep

gradient, followed by approximately 3800 feet of potentially navigable river.  (*Id.*

at 18–19.)  Montana also takes issue with Talen's approach to the segment-by-

segment analysis, arguing that the parties dispute the precise segment boundaries

in this case and that the Court has the discretion to determine "the demarcation of

segments" as well as their navigability for title.  (*Id.* at 19–22.)

In reply, Talen asserts that Dr. Littlefield conceded that Thompson Falls was

non-navigable and routinely portaged, and, based on that concession, it is entitled

to summary judgment concerning the Thompson Falls Segment.  (Doc. 297 at 8–

9.)  Talen argues that the log floats Montana cites took place after the Thompson

Falls Dam was completed, and Montana has not shown (and cannot show) that the

river's condition at that time was not materially different from its condition at

statehood.  (*Id.* at 10–11.)  Talen argues that Montana's arguments concerning

segmentation are contrary to *PPL* "and the segmentation opinions of [Montana's]

experts," and the State should not now be permitted to assert that navigability

should be determined individually for sub-portions of broader segments identified

by its experts.  (*Id.* at 11–13.)  Talen further asserts that the State's evidence is

14

insufficient to create a genuine dispute of material fact concerning the Thompson

Falls Segment's susceptibility to navigation at statehood.  (*Id.* at 13–14.)

To the extent Talen moves for partial summary judgment in its favor on the

navigability in fact of the Eddy Segment, such motion will be denied because

Montana has introduced evidence sufficient to establish a genuine dispute of

material fact concerning the navigability of the Eddy Segment, including actual use

by boats of part of the segment and log drives throughout the segment, physical

characteristics suggesting susceptibility of steamboat navigation, and historical

evidence of significant interest in establishing steamboat navigation of the

Segment near the time of statehood, although those aspirations apparently were not

realized (Doc. 275-3 at 4–5, 8; Doc. 275-15 at 2–3).

The Thompson Falls Segment presents a closer question.  Dr. Littlefield,

Montana's historical expert, opined that Thompson Falls "was neither navigated

nor susceptible of navigation for trade and travel" and was "routinely portaged by a

relatively short distance of about two miles."  (Doc. 275-13 at 2.)  There is some

evidence of at least one pre-statehood log raft from Weeksville (which another

expert, Dr. Jay Brigham, opined was in the Eddy Segment) over Thompson Falls,

although it ended in tragedy when it was caught in the rapids at Thompson Falls

and resulted in one person's death.  (Doc. 275-3 at 3–4.)  Dr. Brigham concluded

that "Thompson Falls was not navigable and portages around the falls were

15

necessary." (*Id.* at 8.)  Talen is correct to observe that much of the evidence of log drives over Thompson Falls post-dates statehood and completion of the Thompson Falls Dam, which Talen asserts made the river more susceptible to navigation, and Montana presented no evidence to show that the Thompson Falls Segment's post-statehood conditions were not materially different from the conditions at statehood. (*Id.*; Doc. 275-5 at 2–3.)  There is some evidence that, by the time of statehood, interest in navigating the portions of the Clark Fork River including Thompson Falls had waned following the arrival of railroad transportation in the surrounding areas, which could explain the dearth of evidence of actual use.  (Doc. 275-9 at 7–8; *see also* Doc. 275-11 at 4 (opining that availability of rail travel coincided with less use of rivers for travel more broadly).)

The only evidence of navigability of the Thompson Falls themselves presented at this summary judgment stage appears to be a log drive that ended in disaster.  (Doc. 275-3 at 3–4.)  Moreover, some of Montana's experts have conceded that the Falls required a portage (*e.g.*, Doc. 275-13 at 2), which ordinarily is fatal to a claim of navigability.  *PPL*, 565 U.S. at 597.  However, the Falls themselves do not comprise the entire Thompson Falls Segment as delineated by the parties; Montana has introduced evidence that 3800 feet of the Segment have a much lower gradient than the Falls.  (Doc. 275-6 at 3.)  Thus, assuming without deciding that there is no material dispute that the Thompson Falls

16

themselves were not navigable for title, the question becomes whether the Court

should determine at this stage that the Thompson Falls Segment as delineated by

the parties' experts is non-navigable in its entirety as a matter of law, or whether

disputed contentions of navigability of other portions of the Segment will require

the Court to engage in its own segmentation based on the evidence presented at

trial.  On this question, the State has the better argument, and the Court declines to

determine navigability of the entire Thompson Falls Segment (as it has been

delineated by the parties' experts) as a matter of law at this time.

Talen is correct that *PPL* requires the Court to determine navigability on a

segment-by-segment basis.  *PPL*, 565 U.S. at 593.  But the Court has repeatedly

emphasized "the importance of determining 'the exact point at which navigability

may be deemed to end.'"  *PPL*, 565 U.S. at 594 (quoting *Utah*, 283 U.S. at 90).

The *PPL* Court further tied segmentation to "[p]hysical conditions *that affect*

*navigability*[.]"  *Id.* at 595 (emphasis added).  The *PPL* Court did not prescribe a

rigid approach of determining segmentation based on physical conditions without

reaching the ultimate issue of navigability, as Talen proposes.  Likewise, in *Utah*,

the Court sustained the State's exception to a determination of non-navigability

where a 4.35 mile section of a 40.5 mile segment identified by the master "d[id]

not differ in its characteristics, with respect to navigability, . . . save that there is

more water and a slightly increased gradient" from other river segments deemed

navigable, and a government engineer described 4.2 miles of the 4.35 as "quiet water[.]"  283 U.S. at 80, 89.  The Court stated that "the exact point at which navigability may be deemed to end . . . should be determined precisely[,]" either by agreement of the parties or further factfinding.  283 U.S. at 80, 89–90.  The gravamen of these decisions is that the final determination of segmentation is tied to navigability, rather than solely based on physical conditions or topographical or geographical indicators that are relevant to, but not necessarily dispositive of, determining where navigability begins or ends.  *See PPL*, 565 U.S. at 595.  Talen's approach would have the Court conduct the analysis backwards by determining that an entire mile of river is not navigable for title based on the non-navigability of 1100 feet of that mile because the parties' expert witnesses agree—but have not stipulated—that the river mile is a "segment."

Defendants raise in a related motion in limine an argument that this approach to segmentation is foreclosed by the *PPL* Court's ruling concerning the Great Falls Segment, arguing that "Montana's attempt to carve up the Great Falls reach . . . into smaller bits in hopes of salvaging some riverbed for its title grab expressly was rejected by the Supreme Court."  (Doc. 283 at 9–11.)  But that characterization of *PPL* is not quite accurate.  The *PPL* Court rejected the Montana Supreme Court's determination that the Great Falls reach was a "short interruption" in a river otherwise navigable despite the uncontroverted evidence

18

that portage was required around the *entire* reach of "five waterfalls and

continuous rapids in between" because the entire reach was "nonnavigable." 565

U.S. at 597–99. If the evidence at trial demonstrates that portage was required

around the entire river mile identified by the parties as the Thompson Falls

Segment, *PPL* will require the Court to conclude that the river mile was non-

navigable. Or it could be shown at trial that smaller subdivisions of this river mile

cannot satisfy *PPL*'s requirement that a segment be "substantial." *PPL*, 565 U.S.

at 596–97; *see also Utah*, 283 U.S. at 77 ("The question here is not with respect to

. . . a negligible part, which boats may use, of a stream otherwise nonnavigable.

We are concerned with long reaches with particular characteristics of navigability

or nonnavigability . . . ."). Or proper segmentation may instead require

identification of the precise start and end points of the two-mile portage described

by Dr. Littlefield. (Doc. 275-13 at 2.) These remaining questions concerning

proper segmentation demonstrate that the evidence is not so conclusive as to justify

judgment as a matter of law as to the Thompson Falls Segment as delineated by the

parties' experts at this time.

To be sure, an opinion from the Fourth Circuit suggests in dicta that "any

non-navigable portion" of a segment "would prevent the segment from satisfying

the *PPL Montana* test[,]" *North Carolina v. Alcoa Power Generating, Inc.*, 853

F.3d 140, 153 (4th Cir. 2017), but in that case, the State did not contest treatment

of the 45 miles of river at issue as a single segment before the district court, and it did not propose any alternative segmentation, *id.* at 150; *see also North Carolina v. Alcoa Power Generating, Inc.*, No. 5:13-CV-633-BO, 2015 WL 2131089, at *1 (E.D.N.C. May 6, 2015) ("The parties stipulated that the relevant segment for purposes of navigability is the 45-river-mile segment . . . ."). By contrast, the parties here have not stipulated to segmentation, the trial in this case has not yet begun, and the Court must make its determinations of segmentation and navigability based on the evidence ultimately presented. *See PPL*, 565 U.S. at 593–94. The Court may ultimately agree with the experts' consensus opinions concerning segmentation of the disputed river reaches at issue, but even consensus expert opinions are not dispositive evidence of a fact in issue sufficient to grant partial summary judgment in this case. *See* Fed. R. Evid. 702(a). The weight to be assigned to those opinions is an issue for trial. At this stage, genuine disputes of material fact concerning both navigability and proper segmentation of the Clark Fork River surrounding Thompson Falls preclude partial summary judgment.

## 2.      The Preclusive Effect of the 1910 Decree

The 1910 Decree stemmed from a declaratory action in this Court (*Steele v. Donlan*) in which private parties disputed the superiority of water rights in the Clark Fork River. (Doc. 261 at 13–14.) One of the defendants—Northwestern Development Company ("NDC"), Talen's predecessor—alleged in support of its

counterclaims that "on and prior to February 16, 1905 . . . , the Clark's Fork of the Columbia, was [and] ever since been and now is, a non-navigable stream." (Doc. 261 at 14.)  The federal declaratory plaintiff then filed a lawsuit against Montana in state court (*Steele v. State*) in which he alleged that the river was navigable and its riverbeds were subject to condemnation from the State by a private party.  (*Id.*)  The State filed demurrers to the complaint but did not raise any issues as to the navigability of the river.  (*Id.* at 15.)

Meanwhile, the federal court held a trial on the merits in which the federal plaintiff introduced no evidence, but the defendants did, including evidence of the non-navigability of the Clark Fork River.  (*Id.*)  The court entered Findings of the Court and a Decree next day, which concluded that "Clark's Fork of the Columbia River at all points in Sanders County, Montana, always was and is a non-navigable, torrential, mountain stream, full of rapids and falls and incapable of being used to transport the products of the country in the usual manner of water transportation."  (*Id.* at 15–16.)  The Decree ordered that title would be quieted in the defendant for six miles above Thompson Falls, including the river bed.  (*Id.* at 16.)  Montana never attempted to intervene in the action.  (*Id.* at 17.)

In state court, the trial court overruled Montana's demurrers, but Montana obtained a writ of prohibition from the Montana Supreme Court and ended the

lawsuit before the State had to file an answer to the plaintiff's allegations, including the allegation of the Clark Fork River's navigability.  (*Id.* at 16.)

Talen argues that Montana acquiesced in the determination of non-navigability because the State wanted to facilitate hydropower development like the Thompson Falls Project proposed and ultimately completed by the defendants in the federal declaratory action, and Montana later participated in licensing for the Thompson Falls Project without raising any issues as to navigability.  (*Id.* at 17–19.)

Talen argues that the 1910 Decree precludes Montana from asserting title to the disputed reach of the Clark Fork River on several grounds.  (Doc. 261 at 20–32.)  First, Talen asserts that issue preclusion bars Montana from relitigating the issue of navigability at statehood of the first six miles of the Eddy Segment, and because the non-navigability of part of a segment renders its entirety non-navigable, Montana cannot relitigate navigability of any of the Eddy Segment.  (*Id.* at 21–24 (citing *PPL*, 565 U.S. at 594–95).)

Next, Talen argues that claim preclusion bars Montana's claim to the Thompson Falls Segment (River Mile 207.1 to 208.1) and the first six miles of the Eddy Segment (River Mile 208.1 to 214.1) because that land was awarded to NDC in the 1910 Decree.  (Doc. 261 at 23–24.)

Talen acknowledges that Montana was not a party to the litigation leading to the 1910 Decree, but it argues that Montana's failure to assert ownership of the Clark Fork River in *Steele v. State* and failure to intervene in *Steele v. Donlan* induced Talen's predecessor, NDC, "to believe Montana would not make a claim of ownership of the riverbeds and interfere with its hydroelectric project[,]" and thereby created reliance interests that Montana should not now be allowed to destroy. (Doc. 261 at 24–29.) Talen further argues that the Supreme Court's *PPL* opinion invited consideration of agreement or acquiescence principles by specifically citing the 1910 Decree and reliance by PPL and its predecessors on the State's "long failure to assert title" as "some evidence to support the conclusion that the river segments were nonnavigable for purposes of the equal-footing doctrine." (Doc. 261 at 29–30 (quoting *PPL*, 565 U.S. at 604).)

Montana responds that it is not precluded from asserting title to the riverbeds at issue in *Donlan* on several grounds. Montana pushes back against Talen's non-party preclusion arguments by arguing that Montana was never in privity with any party in *Donlan* and had no substantive legal relationship with any of the parties to the case. (Doc. 272 at 27–30.) The State also argues that the doctrine of acquiescence does not foreclose its claims because it has a fiduciary obligation to seek rents on trust lands it owns, and the acquiescence doctrine applies to boundary

23

disputes between states, in contrast to the water rights dispute between private parties in *Donlan*.  (*Id.* at 30–32.)

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).  A party asserting claim or issue preclusion bears the burden of establishing all necessary elements. *Id.* at 907.  "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.' . . .  Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* at 892 (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748–49 (2001)).

Generally, claim preclusion and issue preclusion do not apply to a person (or, here, a state) who was not a party to the previous litigation.  *Id.* at 892–93. Talen has not shown that Montana falls into any of the six expressly recognized categories of exceptions to this general rule with respect to the 1910 Decree; for example, Talen has not shown that Montana expressly agreed with any of the parties to *Steele v. Donlan* that it would be bound by the court's determination of navigability.  *See id.* at 893–95.  Rather, Talen relies on an exception to the nonparty preclusion rule that the Supreme Court expressly declined to consider,

24

which expands the agreement exception to include nonparties whose conduct

reasonably induces a party to believe that the nonparty would make no claim

against him or that the nonparty would govern its conduct by the judgment in the

original action. *Id.* at 894 n.7; Restatement (Second) of Judgments § 62 (1982).

Talen cites no authority in which courts within this Circuit or District have

applied that exception, and the Court has found none.  Instead, Talen analogizes to

the doctrine of acquiescence, which the Supreme Court has applied in original

jurisdiction cases involving boundary disputes between states. *Ohio v. Kentucky*,

410 U.S. 641, 648–51 (1973).  The Court is not persuaded that this doctrine arising

from such a unique category of cases provides a standalone basis to preclude

Montana's claims or support for expanding the recognized exceptions to the rule

against nonparty preclusion.  To be sure, the Supreme Court in *PPL* acknowledged

the findings of the 1910 Decree and "the reliance [by Defendants] upon the State's

long failure to assert title," but it cited them as "evidence to support the conclusion

that the river segments were nonnavigable[,]" not as legal bases for entirely

precluding Montana's claims.  *PPL*, 565 U.S. at 600, 604.  In sum, Talen has not

met its burden of proving an essential element of both issue preclusion and claim

preclusion: that Montana was a party to the earlier adjudication or that one of the

exceptions to the rule against nonparty preclusion applies. *Taylor*, 553 U.S. at

892–93.  Accordingly, the Court need not address whether Talen has satisfied the

other elements of issue preclusion or claim preclusion, and Talen's motion for

partial summary judgment as to the Clark Fork River Segments (Doc. 260) will be

denied.

## II.   Motions In Limine

"A motion in limine is a procedural mechanism to limit in advance

testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108,

1111 (9th Cir. 2009).  Although the Federal Rules of Evidence do not explicitly

prescribe it, the Supreme Court authorizes trial judges to rule on motions in limine

pursuant to their authority to manage trials.  *Luce v. United States*, 469 U.S. 38, 41

n.4 (1984).  By ruling in limine, the court "gives counsel advance notice of the

scope of certain evidence so that admissibility is settled before attempted use of the

evidence before the jury." *Heller*, 551 F.3d at 1111–12.

"A district court is accorded a wide discretion in determining the

admissibility of evidence under the Federal Rules." *Sprint/United Mgm't Co. v.

Mendelsohn*, 552 U.S. 379, 384 (2008) (internal quotation omitted).  Still, a motion

in limine should not be used to resolve factual disputes or weigh evidence.  *See C

& E Servs., Inc. v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008).  Instead,

the evidence must be "clearly inadmissible on all potential grounds" to exclude it

on a motion in limine.  *See, e.g.*, *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d

844, 846 (N.D. Ohio 2004).  "Unless evidence meets this high standard,

26

evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in the proper context." *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).

The parties' evidentiary objections largely fall into two categories: relevance and the admissibility of expert testimony.

Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence generally is admissible. Fed. R. Evid. 402. "Rule 401's 'basic standard of relevance . . . is a liberal one.'" *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587 (1993)). "Evidence may be relevant even if it is redundant or cumulative, or if it relates to undisputed facts." *Boyd v. City & Cty. of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009).

Federal Rule of Evidence 702 governs the introduction of expert opinion testimony. Plainly stated, "[t]estimony is admissible under Rule 702, if the subject matter at issue is beyond the common knowledge of the average layman, the witness has sufficient expertise, and the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion." *United States v.*

*Winters*, 729 F.2d 602, 605 (9th Cir. 1984).  Under Rule 702, the district judge

must perform a gatekeeping function to ensure that the evidence is "not only

relevant, but reliable."  *Daubert*, 509 U.S. at 589.  The test of reliability is a

"flexible" one, and *Daubert*'s list of specific factors neither necessarily nor

exclusively applies to all experts or in every case.  *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 141 (1999).  As a result, Rule 702 leaves a trial judge "considerable

leeway in deciding . . . how to go about determining whether particular expert

testimony is reliable," and whether a *Daubert* hearing is even required.  *Id.* at

152; *see also United States v. Alatorre*, 222 F.3d 1098, 1100–02 (9th Cir. 2000)

(holding that trial courts are not compelled to conduct pretrial hearings to

discharge the gatekeeping function under *Daubert* as to expert testimony).  This

flexibility is at its apex in a bench trial because "*Daubert* is meant to protect *juries*

from being swayed by dubious scientific testimony.  When the district court sits as

the finder of fact, there is less need for the gatekeeper to keep the gate when the

gatekeeper is keeping the gate only for himself."  *United States v. Flores*, 901 F.3d

1150, 1165 (9th Cir. 2018) (quoting *David E. Watson, P.C. v. United States*, 668

F.3d 1008, 1015 (8th Cir. 2012)).  "In bench trials, the district court is able to

'make its reliability determination during, rather than in advance of, trial.  Thus,

where the factfinder and the gatekeeper are the same, the court does not err in

admitting the evidence subject to the ability later to exclude it or disregard it if it

28

turns out not to meet the standard of reliability established by Rule 702.'" *Id.*

(quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

In testing reliability, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The trial court must avoid excluding opinions "merely because they are impeachable," as the basic objective is simply to "screen the [factfinder] from unreliable nonsense opinions." *Alaska Rent–A–Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

### a. Relevance-Based Motions

### 1. Defendants' Motion to Exclude Evidence of Non-Commercial Use and/or Pre-Statehood Use by Watercraft Not Customarily Used in Trade and Travel at Time of Montana Statehood

Defendants move to exclude as irrelevant two related categories of evidence: non-commercial use of the rivers at issue before statehood, and use of the rivers by watercraft that Defendants assert were not customarily used in commerce at the time of statehood. (Doc. 279.)[2] Although Defendants appear to concede that the

---

[2] Talen and NorthWestern filed the motion, and the United States filed an "Omnibus Motion in Limine" concurring with the arguments in each of Talen and NorthWestern's motions in limine (Docs. 279, 282, 287). (Doc. 293.)

challenged evidence is relevant in their reply brief (Doc. 318 at 2–3), the Court will address the motion.

As to the first category of evidence, Defendants rely heavily on the *PPL* Court's statement that "[m]ere use by initial explorers or trappers, who may have dragged their boats in or alongside the river despite its nonnavigability in order to avoid getting lost, or to provide water for their horses and themselves, is not itself enough" to establish navigability for title, and that "evidence must be confined to that which shows the river could sustain the kinds of commercial use" that might have occurred at statehood.  (Doc 280 at 11–13 (quoting *PPL*, 565 U.S. at 600).) The Court's warning that evidence that explorers or trappers utilized rivers to avoid getting lost or as water resources would not be sufficient *in itself* to prove navigability is easily understood as a warning against relying exclusively on evidence that rivers were used as tools or resources by humans, rather than *navigated* by watercraft, to award title to a state.  The Court did *not* hold that evidence of non-commercial use of a river is entirely irrelevant to determining navigability for title.  Rather, *PPL* expressly *approved* considering non-commercial use, including "[e]vidence of recreational use, depending on its nature" as potentially probative of navigability.  565 U.S. at 600–01.  Defendants have not established that all evidence of pre-statehood non-commercial use of the rivers at issue fails to meet the low bar for relevance.

30

As to the second category, Defendants' arguments are similarly flawed. Defendants assert that evidence of certain historical watercraft using Montana's rivers is irrelevant because one of Montana's expert historians testified at his deposition that he was not aware of anyone using watercraft other than a steamboat as the customary mode of trade and travel in commerce on one section of the Clark Fork River at the time of statehood. (Doc. 280 at 14.)  But Defendants cite no authority for the proposition that a particular watercraft must have been the customary mode of trade or travel in commerce *on a particular stretch of river* at the time of statehood to be relevant to determining whether that river was navigable for title.  Nor could they.  If that were the test, a party could only demonstrate navigability for title through proof of actual use, and the "susceptible of use" test would have no effect.  *PPL*, 565 U.S. at 600–01.  Defendants' other citation to deposition testimony fares no better; Montana's expert historian testified that some boats listed by counsel were not typical means of commercial trade in the 1880s (Doc. 280 at 14–15), but that list of boats was not exhaustive (*see* Doc. 318-1 at 4), and that testimony does not establish that evidence of use of those boats on the rivers at issue is entirely irrelevant to demonstrating the rivers' susceptibility of commercial navigation.  *See PPL*, 565 U.S. at 600–01. Defendants have not established at this stage that the evidence described in their motion is inadmissible on all potential grounds, and the Court therefore cannot

31

exclude this evidence as irrelevant outside of the context in which it may be

introduced at trial.  Accordingly, the Court reserves ruling on Defendants' motion

(Doc. 279) until trial.

## 2.  Defendants' Motion in Limine Regarding Entire Segments and FERC Project Boundaries

Defendants move to exclude "evidence that reaches within a segment may

be adjudicated separately from the entire segment to determine navigability-for-

title" (Doc. 282), and evidence of Federal Energy Regulatory Commission

("FERC") project boundaries as irrelevant to determining navigability for title

(Doc. 283 at 2).  Defendants argue that the FERC project boundaries "have no

evidentiary value in this phase" of the trial and that "Montana's attempt to carve up

a single segment into navigable and non-navigable reaches is directly contrary to

the law as articulated by the U.S. Supreme Court in this case and should be

excluded."  (Doc. 283 at 5.)

For the reasons discussed *supra*, Defendants' approach to segmentation as

an issue that must be decidedly separately from, and prior to, the issue of

navigability is inconsistent with Supreme Court precedent.  *Utah*, 283 U.S. at 80,

89–90.  Thus, the Court will not issue an order requiring blanket exclusion of

evidence or argument concerning "adjudication of title navigability of smaller

reaches within a larger segment."  (Doc. 283 at 12.)  Defendants' concerns about

"trial-by-ambush" (*id.* at 18) may be appropriately addressed at trial; in particular, Rule 37(c)(1) of the Federal Rules of Civil Procedure forbids a party from using information or a witness that the party fails to disclose as required by Rule 26(a) or (e) "unless the failure was substantially justified or is harmless." The Court's conclusion that segmentation is tied to navigability should not be read as an invitation to the parties to attempt to introduce evidence—*especially* expert opinions, *see* Fed. R. Civ. P. 26(a)(2)(B)(i)—that were not disclosed as required by Rule 26(a) or (e).

As to the relevance of FERC project boundaries, Defendants assert that they "have nothing to do with title navigability" and that the Court "should exclude extended evidence or argument regarding the FERC Project boundaries as irrelevant" at this stage of the litigation because the Court must determine navigability by river segment, not merely within the boundaries of Montana's asserted ownership. (*Id.* at 13.) In response, Montana explains that the FERC boundaries are "plainly relevant to the navigability phase of this case as that evidence will guide the navigability inquiry" by showing the precise boundaries of Montana's claims of ownership, and that the Court is "require[d]" to "assess whether those portions Montana has claimed are navigable or not." (Doc. 202 at 14–15.)

Supreme Court precedent does not provide a clear indication of whether this Court must, or must not, make any findings of navigability concerning river reaches outside of the boundaries of Montana's claims of ownership.  In *Utah*, the Court noted the obvious "propriety" of the special master's decision to limit his findings and conclusions as to navigability to only the sections of rivers described in the complaint.  283 U.S. at 77.  But in *Brewer-Elliott Oil & Gas Co. v. United States*, 260 U.S. 77, 86 (1922), in affirming a finding of non-navigability, the Court relied in part on a finding by the District Court that "the head of navigation" on the river in question was well outside the area in controversy.  In this absence of any precedent mandating or forbidding consideration of the navigability of river stretches beyond the State's claimed riverbeds, the Court cannot conclude that evidence relating to the FERC project boundaries is irrelevant or inadmissible for all purposes.  The Court therefore reserves ruling on Defendants' motion (Doc. 282) until trial.

### 3.  Defendants' Motion to Exclude Regulatory Navigability Findings

The United States moves to exclude decisions by the Federal Power Commission concerning regulatory navigability based on the legal distinctions between regulatory navigability analysis and navigability for title analysis.  (Doc. 290.)  The United States specifically seeks exclusion of two FPC decisions: *In re Montana Power Co.*, 7 F.P.C. 163 (1948), *aff'd in part and remanded in part by*

34

185 F.2d 491 (D.C. Cir. 1950), and *Montana Power Co.*, 8 F.P.C. 751, 753 (1949), *order modified in part by* 10 F.P.C. 1015 (1951).  (Doc. 290-1 at 2.)  The United States does not seek to exclude "the historical evidence presented to the FPC in the process of making its findings," conceding that such evidence "is clearly admissible."  (*Id.* at 2–3.)  The United States explains that regulatory navigability, unlike navigability for title, does not require that a river have been navigable at statehood or navigable in its ordinary condition, and may not be defeated by obstructions that can be avoided by portaging.  (*Id.* at 5–8 (citing *PPL*, 565 U.S. at 592, 598, 600).)  As a result, the United States argues, these regulatory navigability decisions are entirely irrelevant to this case.  *Id.* at 8.[3]

In response, Montana stops just short of conceding that the FPC's legal conclusions of regulatory navigability are irrelevant, but it argues that the factual findings on which those conclusions are based are relevant to determining navigability for title in this case, and it "intends to rely only upon historical facts set forth in the Federal Power Commission decisions regarding the Missouri and Clark Fork Rivers."  (Doc. 309 at 2–3.)  In particular, Montana contends that

---

[3] Talen and NorthWestern filed a joinder in the United States' motion, which echoes the motion's arguments and argues that the historical findings in the FPC's decisions are irrelevant to navigability for title.  (Doc. 292.)  Talen and NorthWestern's objections concerning the particular uses of the rivers at issue, the watercraft used, and the timing of such use do not establish that the historical findings are irrelevant for all purposes for the reasons discussed *supra* in relation to Defendants' motion concerning evidence of non-commercial use and pre-statehood use by watercraft purportedly not customarily used in commerce (Doc. 279).

"when historical findings of navigability-in-fact apply the *Daniel Ball* test for use or susceptibility of use, and do not rely on the more permissive temporal elements of federal regulatory authority, but are consistent with the 'time of statehood' and 'natural and ordinary condition' elements of the equal-footing doctrine, those findings are relevant" to navigability for title.  (*Id.* at 6–7; *see also id.* at 7–8 (quoting particular findings).)

The United States argues in reply that the factual findings in the FPC's decisions are not historical evidence, but rather "an administrative agency's *interpretation* of historical evidence that was placed before it, considered under evidentiary and legal standards different from those here, and for different purposes." (Doc. 321 at 2.)  The government asserts that courts have properly excluded evidence of administrative agencies' findings of fact where the factfinder has before it the same evidence the agency relied upon.  (*Id.* at 2–3.)  The United States observes that the *PPL* Court recounted a significant amount of record evidence in its opinion, but it cited the FPC proceedings only for the proposition that Montana was aware of the facilities on its claimed riverbeds.  (*Id.* at 4.) Finally, the United States argues that Defendants contest the FPC's interpretation of the historical evidence, such as Thomas Roberts' report concerning part of the Missouri River, and the Court will be able to review the underlying evidence itself rather than through the FPC's interpretation.  (*Id.* at 4–5.)

36

All parties appear to agree that the FPC's legal conclusions concerning regulatory navigability are irrelevant to this case, and the Court agrees as well. Defendants have not shown, however, that the factual findings underlying the FPC's decisions are inadmissible for any purpose.  The cases the United States relies on, in which courts excluded agency decisions. did not base their decisions solely on relevance but instead considered whether such decisions fell within the hearsay exception for public records (Fed. R. Evid. 803(8)(C)) and whether their probative value was substantially outweighed by the danger of unfair prejudice. *Hall v. W. Prod. Co.*, 988 F.2d 1050, 1057–58 (10th Cir. 1993); *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 64 (2d Cir. 1998).  At this pretrial stage, the Court cannot know whether the FPC's factual findings will be duplicative of original evidence introduced at trial (and therefore carry lower probative value) or whether they may be the only source of a particular piece of information otherwise lost to time.  To the extent Defendants take issue with the FPC's interpretation of evidence, those concerns relate to the credibility or weight to be assigned to the FPC's findings, not their admissibility.  The Court therefore reserves ruling on the United States' motion (Doc. 290) until trial.

**b. *Daubert* Motions**

**1. Montana's Motion to Limit Expert Testimony by Joshua Alexander**

Montana moves for an order limiting the subject matters upon which the United States' expert witness, Joshua Alexander, may testify at trial. (Doc. 276.) Montana contends that Mr. Alexander is a surveyor, and his testimony therefore "should be limited to explaining how the [United States Bureau of Land Management] identifies federal properties." (Doc. 277 at 3.) Montana wishes to exclude any expert testimony by Mr. Alexander concerning other subjects in his expert disclosure, including the similarity of modern-day and statehood-era watercraft, historical matters, hydrology or geomorphology of the rivers at issue, and the ultimate question of navigability, because Mr. Alexander's education is limited to "surveying and mapping[,]" he testified at his deposition "that he has no independent opinions about historical watercraft" and "would defer to the historians to interpret the historical records[,]" and he improperly "criticized the opinions of the State's experts and he offers legal opinions." (*Id.* at 3–6.)

The United States responds that "Mr. Alexander is one of a handful of people in the United States who is charged by the federal government with administratively determining whether a river is navigable for title." (Doc. 299 at 3–4.) It asserts that the means by which he performs this job "is by determining whether particular river segments were navigable in fact or susceptible to being navigated[,]" and "by training and experience Mr. Alexander *is* an expert on surveying and river navigability." (*Id.* at 5.) The BLM's Manual of Surveying

Instructions requires him to follow nine steps in his surveying work, which include considering the physical description of the water body, a description of the water body at the date of statehood, historical evidence of use of the water body as a highway of commerce, the water body's susceptibility of use as a highway of commerce at statehood, and present-day recreational or commercial uses; comparison to similar water bodies that have been declared navigable or non-navigable; and analysis of previous determinations of navigability, among others. (*Id.* at 6.)  The United States asserts that Mr. Alexander's job training and experience qualifies him to consider these factors, and he therefore "has specialized knowledge beyond that of a layman" in the subjects of historic facts, geomorphological data, and various types of watercraft.  (*Id.* at 7.)  The United States further argues that Mr. Alexander has properly considered the opinions of other experts in this case and the facts underlying those opinions.  (*Id.* at 7–9.)  The United States argues that Montana has not met its burden to show a threshold level of unreliability to trigger the Court's *Daubert* gatekeeping function, and the motion therefore should be denied.  (*Id.* at 9.)  The United States also disputes Montana's assertion that Mr. Alexander is offering a legal opinion on the navigability of the rivers at issue, arguing that he is opining on the factual issue of navigability for title based on his application of BLM's methodology, and that some of Montana's experts offer opinions on the same issue.  (*Id.* at 10–12.)

39

Montana has not provided a sufficient basis to limit Mr. Alexander's testimony before trial. The grounds the State raises—Mr. Alexander's education, deference to other experts on particular issues, and criticism of some experts—largely go to the weight of Mr. Alexander's testimony on particular issues rather than its admissibility. At this stage, the United States has presented sufficient evidence that Mr. Alexander possesses the requisite knowledge and expertise to offer his proposed testimony concerning surveying and river navigability based on application of BLM's methodology. As with all expert testimony, at trial, the proponent will be required to lay an adequate foundation and move to qualify the witness as an expert, any party may have the opportunity to object, and the Court must make a reliability determination on the record. *See United States v. Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020). To the extent Defendants wish to elicit expert testimony from Mr. Alexander on subjects beyond surveying and river navigability, they will be required to lay appropriate foundation. Accordingly, the Court reserves ruling on Montana's motion (Doc. 276) until trial.

### 2. Defendants' Motion to Limit Testimony of Jason Cajune

Defendants move in limine to exclude Mr. Jason Cajune "from testifying at trial on the historical use or condition of waterways in the western United States and the customary mode of trade and travel on water at the time of Montana's statehood." (Doc. 287.) Defendants argue that Mr. Cajune "lacks the specialized

40

knowledge and experience" to opine on these topics because he has no direct

knowledge of those facts and would have to rely on the historical and archeological

record, and he "lacks expertise in reviewing and assessing primary and secondary

historical sources for accuracy." (Doc. 288 at 9.)

Montana responds that Mr. Cajune "will inform the Court on historic

watercraft, modern day watercraft, and the handling characteristics of each." (Doc.

307 at 3.)  Specifically, based on his knowledge and experience as a professional

builder of traditional wooden boats, he "has identified craft that were in use in

Montana in 1889 and before" and "provides his opinions as to whether modern day

watercraft which operate on each of the rivers at issue[] are meaningfully similar to

the historic watercraft in use at statehood and before." (*Id.* at 5.)  He also has

provided opinions about whether it was likely that statehood watercraft could

safely and effectively navigate the disputed river reaches based on his review of

expert witnesses' analysis of the river segments at issue at statehood, his

knowledge of boat operation, design, and handling characteristics, and his

experience as a professional river guide handling boats on the rivers at issue or

rivers with similar water conditions. (*Id.* at 6.)  Montana argues that Mr. Cajune

has not opined and will not opine on the conditions of the rivers at issue at

statehood; rather, his testimony will assist the Court in assessing the susceptibility

of the rivers to navigation by applying his "knowledge and experience with

41

tradition and modern watercraft on Montana's rivers, as well as his knowledge of the characteristics of the same or similar boats in existence at statehood, and how such boats would handle the river conditions described by the expert geomorphologists." (*Id.* at 20–25.)

In reply, Defendants clarify that they do not object to Mr. Cajune providing expert testimony "relating to the design, construction and operation of contemporary watercraft[.]" (Doc. 323 at 2 n.1.) Defendants argue that Montana cannot show that it is reasonable for Mr. Cajune to rely on the opinions of geomorphologists in forming his own expert opinions, but they do not explain why that is the case. (*Id.* at 5 n.2.) Defendants collect numerous cases in which courts concluded that proposed experts whose expertise was drawn primarily from work experience failed to establish that they had the necessary knowledge, skill, and experience to provide an expert opinion. (*Id.* at 5–10.)

The Court concludes that Defendants have not shown that a pretrial order limiting Mr. Cajune's testimony in the manner they request is warranted. The cases on which Defendants rely do not compel the conclusion that Mr. Cajune, as a witness whose expertise is drawn mostly from experience, cannot establish that his proposed testimony is reliable. At this stage, Montana has established that Mr. Cajune has sufficient knowledge and experience to offer his proposed testimony concerning watercraft and their handling characteristics. As with Mr. Alexander's

42

testimony, Mr. Cajune must establish a sufficient foundation for his testimony at trial, including any expert opinions, and Defendants may make appropriate objections at trial.  But at this stage, Defendants' objections to Mr. Cajune's testimony—namely, his educational background and experience evaluating primary and secondary historical sources—go to its weight rather than its admissibility.  The Court will reserve ruling on Defendants' motion (Doc. 287) until trial.

### 3.  United States' Motion to Preclude Testimony Regarding Surveyors' Decision to Meander River

The United States moved to exclude testimony and argument "that a [United States General Land Office ("GLO")] field surveyor's decision to meander a river after 1884 creates any inference of navigability" and to preclude Montana's expert historian, Dr. Littlefield, from testifying about surveying requirements, which the United States asserts is beyond the scope of his expertise.  (Doc. 291.)[4]  The United States argues that Dr. Littlefield's interpretation of land surveyors' duties at the time of Montana's statehood is incorrect and beyond the scope of his expertise as a historian, and he therefore should be precluded from testifying about those topics under *Daubert*.  (Doc. 291-1 at 6–7.)  The United States asserts that Dr. Littlefield erred in concluding that a GLO surveyor who meandered a portion of the Clark

---

[4] NorthWestern filed a joinder in this motion.  (Doc. 294.)

Fork River in 1889 must have determined that that portion of the river was navigable because Dr. Littlefield did not recognize a change to GLO's surveying instructions that instructed surveyors to meander navigable rivers *or* rivers that were greater than three chains (or 198 feet) wide.  (*Id.* at 3–4, 5 n.5, 6–9.)  The United States further argues that GLO survey notes do not establish navigability for title because GLO surveyors do not have the power to settle questions of navigability, and Dr. Littlefield's "conclusion to the contrary goes against well-established law" and should be excluded.  (*Id.* at 9–10.)

Montana responds that Dr. Littlefield has extensive experience as an expert historian in matters relating to navigability of rivers and water rights, and he routinely reviews surveyors' notes as part of his research.  (Doc. 310 at 4–5.)  The State argues that Dr. Littlefield's conclusions concerning navigability of the Clark Fork River is not based solely on GLO surveys or the surveyors' notes, but rather considers them alongside other historical information.  (*Id.* at 6–7.)  Montana asserts that neither it nor Dr. Littlefield takes the position that GLO surveys or the surveyors' notes are determinative of title navigability as a matter of law; instead, they take the position that the surveys and surveyors' notes are relevant evidence.  (*Id.* at 7–8.)

In reply, the United States does not dispute that the surveys and surveyors' notes can be relevant evidence to determining navigability for title, but asserts that

44

Dr. Littlefield's inferences drawn from those materials, specifically, should be excluded.  (Doc. 320 at 2.)  Specifically, the United States contends that Dr. Littlefield lacked any factual basis for concluding that a GLO surveyor was required to, and did, determine that the Clark Fork River was navigable, and that opinion should be excluded.  (*Id.* at 2–4.)

The United States has not provided a sufficient basis to limit Dr. Littlefield's testimony in the manner it requests before trial.  Even assuming that the United States is correct that Dr. Littlefield erred in interpreting the GLO surveying instructions, surveys, and surveyors' notes, a factual error does not establish that Dr. Littlefield is categorically unqualified to opine on those matters when Montana has presented sufficient evidence that he possesses the requisite knowledge and expertise to testify as a historian.  Rather, the United States' disagreement with Dr. Littlefield's conclusions and bases for that disagreement are quintessential examples of issues going to the weight, rather than the admissibility, of Dr. Littlefield's testimony.  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) ("[I]ssues regarding the correctness of his opinion . . . are a matter of weight, not admissibility.").  Accordingly, the Court reserves ruling on the United States' motion (Doc. 291) until trial.

## CONCLUSION

IT IS ORDERED that Defendants' Motions for Partial Summary Judgment (Docs. 255, 260) are DENIED.

IT IS FURTHER ORDERED that the Court RESERVES RULING on the parties' Motions in Limine (Docs. 276, 279, 282, 287, 290, 291) until trial.

DATED this 7th day of December, 2021.

Dana L. Christensen, District Judge
United States District Court