Robert L. Sterup, Jr.
Brown Law Firm
315 N. 24th Street
Billings, MT 59101
Telephone:  (406) 248-2611
Fax:  (406) 248-3128
Email:  RSterup@brownfirm.com

Kyle Anne Gray
Brianne C. McClafferty
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, MT 59103-0639
Telephone: (406) 252-2166
Facsimile: (406) 252-1669
Email:  kgray@hollandhart.com
        bcmcclafferty@hollandhart.com
Attorneys for TALEN MONTANA, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| STATE OF MONTANA,<br><br>    Plaintiff/Counterclaim Defendant,<br><br>    v.<br><br>TALEN MONTANA, LLC, a Delaware Limited Liability Company, f/k/a PPL Montana, LLC, and NORTHWESTERN CORPORATION, d/b/a NorthWestern Energy, a Delaware Corporation, and the UNITED STATES OF AMERICA, UNITED STATES FOREST SERVICE, UNITED STATES BUREAU OF RECLAMATION, AND UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>    Defendants. | Cause No. 6:16-cv-00035-DLC<br><br><br>**DEFENDANT TALEN MONTANA, LLC f/k/a PPL MONTANA, LLC'S RESPONSE TO STATE OF MONTANA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

# TABLE OF CONTENTS

**Page:**

Table of Authorities ................................................................................ ii

I.   INTRODUCTION ...............................................................................1

II.  ARGUMENT......................................................................................2

     A.   Montana's Evidence Failed to Satisfy Its Burden of Proof. .................2

          1.   The Eddy and Thompson Falls Segments Were Not
               Navigable at Time of Statehood. .................................................2

          2.   The Big Belt Mountains Segment Was Not Navigable at
               Time of Statehood.....................................................................10

          3.   The Black Eagle, Big Falls, West Yellowstone, Upper
               Canyon, Anabranching, and Bear Trap Canyon Segments
               Were Not Navigable at Time of Statehood..............................13

     B.   Invitation to Depart From the *PPL* Mandate Must Be Rejected.........14

          1.   Commercial Reality, One Navigability Requirement
               Montana Could Not Meet. ........................................................14

          2.   Commercial Watercraft On a Highway of Commerce,
               Not Just Any Boat That Can Float, Another Navigability
               Requirement Montana Could Not Meet....................................16

III. CONCLUSION...................................................................................22

CERTIFICATE OF COMPLIANCE.....................................................24

# TABLE OF AUTHORITIES

**Page(s):**

*Brewer Elliot Oil & Gas Co. v. United States*,
    260 U.S. 77 (1922)............................................................................17, 21

*Gratz v. McKee*,
    270 F. 713 (8th Cir. 1920) ......................................................................18

*Hardy v. State Land Bank*,
    P.3d 647 (Ore. App. 2015 ........................................................................19

*Jenson v. BMW of North Am., LLC*,
    331 F.R.D. 384 (S.D. Cal. 2019) ..............................................................8

*The Montello*,
    87 U.S. 430, 441-43 (1874) .....................................................................19

*North Carolina v. Alcoa Power Generating, Inc.*,
    853 F.3d 140 (4th Cir. 2017) .............................................................15, 21

*Oklahoma v. Texas*,
    258 U.S. 574 (1921)...........................................................................21, 22

*Oregon v. Riverfront Protection Ass'n*,
    672 F.2d 792 (9th Cir. 1982) ...................................................................19

*PPL Mont. v. State*,
    229 P. 3d 421 (Mont. 2010).....................................................................16

*PPL Montana, LLC v. Montana*,
    565 U.S. 576 (2021).........................................................................*passim*

*Puget Sound Power & Light Co. v. Fed. Energy Regul. Comm'n*,
    644 F.2d 785 (9th Cir. 1981) ...................................................................19

*Sidhu v. INS*,
    220 F.3d 1085 (9th Cir. 2000) ...................................................................8

*United States v. Appalachian Elec. Power Co.*,
    311 U.S. 377 (1940)................................................................................19

*United States v. Brewer-Elliot Oil & Gas Co.*,
   249 F. 609 (W.D. Okla. 1918) ...........................................................................17

*United States v. Hansen*,
   40 F. 4th 1049 (9th Cir. 2022) ............................................................................7

*United States v. Oregon*,
   295 U.S. 1 (1935) ..............................................................................14, 15, 17

*United States v. Utah*,
   283 U.S. 64 (1931) ................................................................................7, 18, 20

*Utah v. United States*,
   304 F.2d 23 (10th Cir. 1962) ............................................................................20

iii

Pursuant to the Court's Order of September 16, 2022 (Doc. 411), Defendant Talen Montana, LLC ("Talen"), by and through its counsel of record, hereby submits its Response to Montana's Amended Proposed Findings of Fact and Conclusions of Law.  This is a complex case with many important issues, but this Response will only address the most hotly contested issues; however, to the extent Talen does not address an issue here, it reaffirms positions already taken in its post-trial brief, Doc No. 393, and adopts the positions taken by its co-defendants in their post-trial briefs and responses to Montana's proposed findings of fact and conclusions of law, Doc. Nos. 396, 401 and 402.

## I.     **INTRODUCTION**

Montana's Amended Proposed Findings of Fact and Conclusions of Law (Doc. 394) invite this Court to ignore *PPL Montana, LLC v. Montana*, 565 U.S. 576 (2021) ("*PPL*") – the "instruction manual" for this Court's decision on remand – and instead to follow a handful of contrary state court decisions and inapposite, pre-*PPL,* lower federal court decisions.  Montana does so because at trial it failed, as required by *PPL*, to provide competent, credible evidence that in 1889 *any* of the disputed river segments were (i) used as a highway for trade and travel, or (ii) could sustain the kinds of commercial use which "as a realistic matter, might have occurred at the time of statehood" on Montana's rivers.  *Id.* at 600.

1

Statehood-era Montanans wanted to use the pertinent river segments to support their broad commercial endeavors but did not because they determined the segments simply were not *commercially* navigable.  At trial, there was only evidence of no use, or of failed attempts to use, which paints a compelling picture of *non*-navigability under *PPL*.  With that, Montana's quest to have declared navigable river segments that our statehood-era predecessors clearly decided were non-navigable crashed into an immovable boulder – history.

## II.   ARGUMENT

**A.   Montana's Evidence Failed to Satisfy Its Burden of Proof.**

**1.   The Eddy and Thompson Falls Segments Were Not Navigable at Time of Statehood.**

Montana's proposed Findings and Conclusions for the Thompson Falls and Eddy segments of the Clark Fork River fail to address a simple threshold inquiry: *Why was this purportedly navigable river not actually navigated in commerce at time of Montana statehood?*  In so doing, Montana overlooked a fundamental principle articulated by the Supreme Court herein – the best evidence that a river is navigable-in-fact is whether the river was actually used for navigation.  *PPL*, 565 U.S. at 601 ("the most persuasive form of evidence" for navigability at statehood is proof of "extensive and continued historical use for commercial purposes").

Commercial demand at time of statehood was robust.  Gold strikes in 1860's Montana quickly transformed the region.  Doc. 392, Northwestern/Talen Amended

Proposed Findings of Fact and Conclusions of law (hereinafter "NW/Talen FOF") ¶131. The population increase in the region was so dramatic that the federal government created the Montana Territory in 1864. NW/Talen FOF¶132. By January 1878, Montana smelted one-fourth of all American silver produced. NW/Talen FOF¶134.

To meet this commercial demand, the Clark Fork River was navigated below Thompson Falls, but *not* above Thompson Falls. During the period 1866-1869, three Oregon Steam Navigation Company steamboats ran from Lake Pend Oreille to a point below Thompson Falls. NW/TalenFOF¶407. In the 1880s, the Henry Villard navigated the Clark Fork to Cabinet Rapids, where, following a portage to Rock Island, travelers and cargo took the Katie Hallet to Thompson's Landing. NW/TalenFOF¶¶413-414. An overland trail connected with a road to Missoula. NW/TalenFOF¶385. It was a "rough and irregular" road, however, and moving cargo and travelers *by water* further upstream to Plains would have bypassed the worst parts of this expensive and time-consuming overland travel. NW/TalenFOF¶385.

Unsurprisingly, efforts to find a navigable waterway *above* Thompson Falls in the decades before statehood were extensive, and unsuccessful. In 1865 John Mullan surveyed the Clark Fork River, ultimately recommending travel by road, not river, from Cabinet Gorge to present day Missoula. NW/TalenFOF¶384. The

Mullan Road, completed in 1866, connected the head of navigation on the Missouri River at Fort Benton with the head of navigation on the Columbia River at Fort Walla Walla, largely paralleling the Clark Fork above Thompson Falls. NW/TalenFOF¶143.  In 1867, John Ross Browne found the Clark Fork was "continually interrupted by shoals, rapids, and falls." NW/TalenFOF¶336.  In 1882, Thomas Symons described Thompson Falls as a "complete obstruction to navigation," NW/TalenFOF¶337, and later characterized the river segments at issue as "a mountain torrential stream, full of rocks, rapids, and falls, [that] is utterly unnavigable, and incapable of being made navigable except at an enormous cost." NW/TalenFOF¶338.

In search of commercial opportunities in Montana, the City of Portland raised funds to improve the road from Cabinet to Plains to connect with the better road to Missoula. NW/TalenFOF¶385.  Interested citizens called on Congress to appropriate additional money to improve "the road between Horse Prairie and Cabinet Landing." NW/TalenFOF¶385.  A series of commercial proponents aspired to steamboat traffic above Thompson Falls – Bancroft, O'Keefe, Browne, Ashley – NW/TalenFOF¶78, and Thomas Francis Meagher certainly spared no purple prose in so advocating; NW/TalenFOF¶425, however, no such steamboat traffic ever occurred.  NW/TalenFOF¶427.  That a small steamer (the Wilson) plied the Clark Fork *above* the Eddy Segment in the placid Plains segment for a

4

short time in the 1880's only serves to underscore the conspicuous lack of commercial traffic on the Eddy segment.  NW/TalenFOF¶¶415-417.

Given strong commercial demand for trade and travel on water, which was significantly less costly than overland trade by road, *see* NW/TalenFOF¶150, the extensive commercial use of the Clark Fork *below* Thompson Falls, repeated surveys concluding that the Thompson Falls was a complete obstruction to navigation, and the decision to construct and use arduous roads rather than the river as a highway of commerce, the question Montana must answer is why were these "navigable" river segments not actually used?  Unable to offer cogent explanation, Montana falls back on speculation, conjecture, and inapposite caselaw that did not survive the *PPL* decision.

Montana's proposed Findings of Fact regarding "actual use" of the Clark Fork comprise twenty-one paragraphs.  *See* Doc. 394, (hereinafter "StateFOF") ¶¶239-260).  Notably missing is *any* evidence of *any* "actual use" of the Thompson Falls or Eddy segments in commerce.  None of the evidence mustered by Montana shows use of the disputed segments by a customary mode of trade and travel: *e.g.*: Thompson and Work travelled in largest part on horseback, and by canoe mostly below Thompson Falls, StateFOF¶¶243-243; NW/TalenFOF¶¶402-403.  Suckley explored for the Mullan survey (which concluded the river above Thompson Falls was not useful for commerce), StateFOF¶¶243, 246-47, NW/TalenFOF¶¶402-404,

5

489; the Wilson, a steamboat, operated for a short time above the Eddy segment but not in the relevant segments, StateFOF¶255, NW/Talen FOF¶415; a ferry above Thompson Falls crossed a part of the Eddy Segment so dangerous that persons swept from the ferry were drowned; StateFOF¶257, NW/Talen FOF¶43, and the "small boat shown in a photo" purportedly was used to rescue men from the dangerous waters above the falls (hardly a use as a highway of commerce). StateFOF¶259.  The steamboat "Missoula" that expert historian Ian Smith conclusively proved never travelled above Thompson Falls (as Dr. Karamanski agreed, and Dr. Littlefield admitted at deposition before attempting to reverse course at trial), NW/TalenFOF¶¶420-428, is sheepishly characterized by Montana as a "possibility" that supports a finding that "people believed" the river above Thompson Falls was "at least susceptible" to navigation.  StateFOF¶253.

Given nearly ten years (from the February 2012 *PPL* decision to the January 2022 trial) to compile some evidence of use in commerce of the Thompson Falls and Eddy segments, Montana's inability to compile any evidence of such actual use speaks volumes.  Montana instead falls back on perhaps the most puzzling contention in this case, namely, that the rivers are susceptible to navigation even though Montanans needed and wanted to use the rivers but never actually did.

As a threshold and practical matter, Montana leaves the principal question unanswered:  If they "could have" used the segments in commerce, why didn't

6

they?  Montana's attempt to proceed to a susceptibility analysis without any evidence explaining why the rivers were not used (other than the river's non-navigable conditions) turns the title navigability principles articulated in *PPL* on their head.  *See* Doc. 402, p. 3 ("susceptibility is a contingent prong of the Daniel Ball test that becomes relevant only if Montana can prove that non-use occurred for a reason other than non-navigability.")  "[The state] … is not to be denied title … because the location of the rivers and the circumstances of the exploration and settlement of the country … made recourse to navigation a late adventure or because commercial utilization on a large scale awaits future demands."  *Utah*, 283 U.S. at 83.  Montana made no such showing.[1]

Against this backdrop, Montana's effort to make the Eddy segment a placid stream capable of easily acting as a highway of commerce invites this Court's abrogation of Occam's Razor – the simplest explanation is more likely correct than one that is more complex.  *United States v. Hansen*, 40 F. 4th 1049 (9th Cir. 2022) (the "dissent's approach is in direct conflict with the principle of Occam's razor, that the simpler approach is usually better").  After Montana's own experts diverged on the navigability of the Thompson Falls segment with its 25-foot drop,

---

[1]  Montana failed at trial to provide evidence to support a conclusion that the disputed segments were not explored and settled at the time of statehood, which is the only way to unlock the susceptibility test.  *See* Doc No. 393 at 19– 2; Doc No. 401 at 16–17; and 402 at 4–6.

NW/TalenFOF¶393 (Dr. Wilcox testified the one-mile Thompson Falls segment was not navigable), ¶394 (Dr. Littlefield opined that a two-mile portage was required);  StateFOF¶¶88-89 (Mr. Cajune testified he could run the Falls in a bateaux), Montana devotes extensive effort to a contention that the "Eddy Segment had sufficient depth and flow to be navigable-in-fact for trade and travel by canoes, pirogues, mackinaws, flatboats, bateaus, and light drafting steamboats." StateFOF¶¶78-84.  Defendants' evidence established that the formidable Thompson Falls, together with three obstacles to navigability in the Eddy segment – at the Eddy Islands, Plains Rapids, and mid-channel bars and riffles – explained *why* historical watercraft did *not* use the Eddy segment as a highway of commerce. NW/TalenFOF¶¶348-372.

Without limitation, the "depths" in the Eddy Islands calculated by Montana at trial[2] ignored the fact that *after* statehood the Thompson Falls reservoir has

---

[2]     Dr. Wilcox took boat-based depth measurements of the Eddy Islands reach, a fact touted by Montana, but did not introduce that evidence at trial. StateFOF¶81; Exh. 13, Wilcox/Schmidt Report p. 132 ("Channel depth between these (Eddy) islands is … indicated by field observations and boat-based measurements with an echosounder that we completed at a base flow condition").  Montana, instead, relied on "back of the envelope" calculations first adduced during its rebuttal case. Failure to introduce the "boat-based measurements with an echosounder" creates an adverse inference.  *Sidhu v. INS*, 220 F.3d 1085, 1092 (9th Cir.2000)(an adverse credibility finding is appropriate where "non-duplicative, material, easily available corroborating evidence" is not produced); *Jenson v. BMW of North Am., LLC*, 331 F.R.D. 384, 390-91 (S.D. Cal. 2019)(an "adverse inference" is warranted that if documents had been produced they would support the requesting party's position).

inundated the Eddy Islands reach, creating greater depths than at time of statehood, NW/TalenFOF¶¶45, 357; local gradients in the Plains Rapids ranged from 11-22 fpm, NW/TalenFOF¶360, which are gradients comparable to Cabinet Gorge where river traffic portaged, NW/TalenFOF¶362; and the mid-channel bars with their associated shallow riffles extended for 3.5 miles, NW/TalenFOF¶370.

The *simplest* explanation for why there was no actual use of the Eddy and Thompson Falls segments as a highway of commerce is found in the geomorphological barriers identified by Defendants' extensive evidence. NW/TalenFOF¶¶348-372.  The more complex explanation – that the segments *could have* been used in commerce but were not – would require the Court to find: (i) Montanans at statehood, and in the decades before, had a crying need for trade and travel, and the Clark Fork river *was* a highway of considerable commerce *below* Thompson Falls; but Montanans (ii) nevertheless bypassed the Clark Fork to conduct trade and travel by a rough and irregular road *above* Thompson Falls, and, therefore; (iii) the Thompson Falls and Eddy Segments *could have been* used in trade and travel but were *not* actually used because miners, merchants, tradespersons and travelers voluntarily and irrationally elected to bypass the river in favor of more arduous and expensive overland trails.  William of Occam would not approve.

As is often the historical case, Montanans voted with their feet.  Standing at the river's edge, intent on transporting goods and persons in commerce, frontier survival in the balance, statehood-era Montanans (unlike recreational daredevil, Jason Cajune), chose *not* to hazard the Thompson Falls in a bateaux, chose *not* to load valuable cargo for transport through the 11-22 fpm gradients at Plains Rapids, and chose *not* to risk their valuable goods through the twisting, turning, shallow Eddy Islands or mid-channel bars and riffles.[3]

The simplest explanation is the best explanation.  The Eddy Segment was not actually navigated because it was not navigable.

### 2. The Big Belt Mountains Segment Was Not Navigable at Time of Statehood.

Montana's evidentiary failures on the Clark Fork were repeated on the Missouri.  After devoting twenty-two paragraphs, StateFOF¶¶95-117, to a contention the Big Belt Mountains Segment *should have* been navigable in commerce at time of statehood, Montana barely touched upon actual use of the

---

[3]   Montana suggests commercial travel need not be "interstate," a proposition with which Talen does not quarrel, and, from this springboard, contends *ipse dixit* that "local travel" is sufficient. What local travel?  Montana introduced no evidence of "local travel" for commercial purposes by water through the Eddy and Thompson Falls Segments, but instead acknowledged a ferry transported goods across (not on) the Clark Fork river in the Eddy segment.  NW/TalenFOF¶¶420-434.  The existence of a ferry in the Eddy segment *disproves* navigability.  NW/TalenFOF¶431 ("It's proof that there is a river there.  It's also proof that the river is in the way.")

10

segment.  Instead, Montana devoted the lion's share of its discussion to Lewis & Clark, StateFOF¶188; the Roberts reconnaissance, ¶¶198-201; Maguire's reconnaissance and attempted improvements, ¶¶204, 206-207; the Army Corp's unsuccessful attempts at improvement, ¶¶205, 208, 211-212; Barker's reconnaissance, ¶¶214-215; navigation above Fort Benton ¶¶194-195; and railroad construction, ¶¶209.  But none of these activities constituted *commercial* uses of watercraft on a "highway for commerce" within the segment at issue.  *PPL*, 565 U.S. at 600-601.

Montana contends that an 1896 Army Corps report places steamers on the Missouri above Fort Benton, StateFOF¶223, but neglects to report that this steamboat traffic was in the Long Pool, NW/TalenFOF¶70, and it followed improvements to the Long Pool.  *Id.*, ¶229.  The "eighteen mackinaws" that Dr. Swartout reported ready to travel the river in the mid-1860s, StateFOF¶197, based on a piece of rank boosterism about what one newspaper "anticipated would happen," defy credulity.  NW/TalenFOF¶¶ 71 ("After 1859 those craft disappear from the record and '[t]here are no records of keelboats or mackinaws commercially engaged in trade and transportation at the time of statehood.'")  Montana acknowledges the fur trade "did not encroach into the Upper Missouri upstream of Great Falls in any significant way," StateFOF¶190, and was nonexistent after the 1830's, StateFOF¶190; NWTalenFOF¶110.

11

And while acknowledging gold strikes brought "thousands of prospectors" to areas immediately adjacent to the Big Belt Mountains Segment, StateFOF¶191, Montana was unable to muster *any* evidence of actual use of that segment by the miners, instead suggesting "**[i]f** watercraft had been coming up the Missouri River to Helena, a portage around the Great Falls would have been required," and "**if** prospectors came up the Missouri River route, an overland route would still be required to ultimately reach the gold fields…." StateFOF¶191 (emphasis added). *See* NW/TalenFOF¶111 ("The references to 'gold travelling' down the Missouri and to travelers on the Upper Missouri on their way 'to Montana gold fields' in Dr. Swartout's report are based on a single source, William Lass' book on Steamboating on the Upper Missouri River. The Lass book exclusively addresses the Missouri *below* Fort Benton, not the Missouri in the Relevant Segments").[4]

Montana also summons the *Little Phil*, StateFOF¶216, a steamboat that briefly operated above the Big Belt Mountains Segment, NW/TalenFOF¶¶284-285, before turning attention to the *Rose* and the *Fern*, StateFOF¶¶217-222, steamboats whose failed attempts *dis*prove commercially realistic trade and travel in the Big

---

[4]    Further showing the unpersuasive nature of Montana's proffered "waiting for the railroads" theory of non-usage, even *after* the railroads arrived in Montana, Professor Lass documents continuing usage of steamboats (and their gasoline-powered successors) on other segments of the Missouri below Fort Benton, at such easier to reach places as Poplar and Fort Union. NW/TalenFOF¶¶73, 80.

Belt Mountains Segment.  NW/Talen FOF¶¶271-283.  Repeated references by Montana to Stubbs Ferry dodge the question why a ferry was necessary at all in the purportedly "navigable" Big Belt Mountains Segment.

In sum, in twenty-nine paragraphs addressed to actual use, StateFOF¶¶186-215, Montana was unable to identify *any* documented non-speculative evidence of *any* actual use of the Big Belt Mountains Segment as a "highway of commerce." Montana acknowledges strong commercial demand including, *inter alia*, "thousands of prospectors," strenuous attempts to improve the river by the Army Corps and private entities, and repeated reconnaissance in hopes of finding or creating a navigable way through.  Nowhere, however, does Montana explain why, if the Big Belt Mountains Segment *could have been* used in commerce, it was *not* actually so used.  As with the Clark Fork River, miners, merchants, tradespeople and enterprising businesspeople on the ground in 1889 provide the unequivocal answer for the Missouri River:  The Big Belt Mountains segment of the Missouri was not navigated because it was not navigable.

   **3.     The Black Eagle, Big Falls, West Yellowstone, Upper Canyon, Anabranching, and Bear Trap Canyon Segments Were Not Navigable at Time of Statehood.**

As for the Eddy, Thompson Falls, and Big Belt Mountains Segments, Montana also offered no evidence of actual use on the Black Eagle, Big Falls, West Yellowstone, Upper Canyon, Anabranching or Bear Trap Canyon Segments.

And as noted by Talen's co-defendants, none of those segments is susceptible to navigation because their geomorphological conditions in 1889 precluded commercially realistic trade and travel.  Doc No. 401 at 17–30.  Talen agrees.

**B.      Invitation to Depart From the *PPL* Mandate Must Be Rejected.**

**1.        Commercial Reality, One Navigability Requirement Montana Could Not Meet.**

Montana endeavors to divorce "customary mode" from "time of statehood," suggesting primitive canoes and skin boats capable of negotiating the river for exploratory (not commercial) purposes decades before statehood establish title navigability at time of statehood irrespective of commercial "profitability."  *See* StateFOF¶¶242-247.  In so arguing, Montana cites and relies exclusively on cases pre-dating *PPL*.  This invitation to depart from the *PPL* mandate must be rejected.

Under *PPL*, navigability "concerns the river's usefulness for 'trade and travel,' *rather than for other purposes*."  *PPL*, 565 U.S. at 600 (emphasis added).  Exploratory forays are insufficient.  *Id.* ("Mere use by initial explorers or trappers … is not itself enough.")  Instead, the use must be consistent with "commercial reality" as it was "as of the time of statehood."  *Id.* at 600-603.  As the Supreme Court firmly insisted, for title navigability "*evidence must be confined to that which shows the river could sustain the kinds of commercial use that, as a realistic matter, might have occurred at the time of statehood.*"  *Id.* at 600 (citing *United States v. Oregon*, 295 U.S. 1, 20-21 (1935) (emphasis added).  The unanimous *PPL*

Court expressly linked susceptibility to "commercial reality." *Id.* at 603 ("neither can that *susceptibility* be so brief that it is not a *commercial reality*.") (emphasis added).

The *PPL* decision is the Supreme Court's mandate in this very case, and on these very rivers, and is, thus, the lodestar that must guide this Court's decision. The Fourth Circuit Court of Appeals applied the dictates of the *PPL* decision to find a river segment non-navigable at statehood because, *inter alia*, the sparse record there nonetheless "revealed both a lack of commercial navigation at statehood and repeated efforts after statehood in attempting to make the relevant segment navigable." *North Carolina v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 150 (4th Cir. 2017) ("*Alcoa*"). Here, a robust record revealed and established the same, making it notable that Montana, with all its citations to pre-*PPL* caselaw, does not point this Court's attention to the Fourth Circuit's compelling decision actually applying the *PPL* standards.

Under *PPL*, Montana's contention that non-commercial use of the rivers by David Thompson (mapping), George Suckley (exploratory), Lewis & Clark (exploratory), Thomas Roberts (searching for a railroad route), Maguire (river improvements), "prominent Helena businessmen" (exploratory), and Barker (reconnaissance for dam construction), *etc.*, all fail *PPL's* "commercial reality" test, as do claims that "[n]or must a river's use be broadly commercial."

15

StateFOF¶27. That is simply wrong under the Supreme Court's mandate requiring that for river segments to be navigable for title purposes they must have been used or proved capable of being used "*as highways of commerce* at time of statehood." *PPL*, 565 U.S. at 600 (emphasis added).

The Montana state courts made the mistake of finding title navigability based on non-commercial use. *PPL Mont. v. State*, 229 P. 3d 421, ¶25 (Mont. 2010) (*e.g.,* basing navigability finding for the Missouri river above the Great Falls on the journals of Lewis and Clark). Montana's invitation to repeat the error should be rejected.

> **2.      Commercial Watercraft On a Highway of Commerce, Not Just Any Boat That Can Float, Another Navigability Requirement Montana Could Not Meet.**

Montana disputes that the upland steamboat was the "only" commercial mode at statehood, instead suggesting that *any boat that could float* qualifies as a "customary mode of trade and travel on water" at statehood. *PPL*, 565 U.S. at 601. This is not hyperbole. Every watercraft identified by Montana as having ever used the rivers was characterized by one or more of Montana's experts as a watercraft that demonstrated title navigability of a given segment, even dugout and birchbark canoes. *See, e.g.,* StateFOF¶182 (Mr. Cajune opined that any boat that could handle Class III rapids, including canoes, bateaus, and skiffs, could make it through Bear Trap Canyon …."); ¶184 (Bear Trap Canyon would "have been

16

navigable in fact for trade and travel in its natural and ordinary condition by canoes, skiffs, and bateaus at the time of statehood in 1889"); ¶89 ("A bateau would be able to go through a line down through the 'pour-over' of the (Thompson) Falls"); ¶116 ("Beartooth Rapids would have been classified as Class II and would not have impeded small boats").

The case law is clear, however, that small boats like Mr. Cajune's dory are *not* commercial vessels, and the fact that they can negotiate a segment does not establish title navigability. *See, e.g.*, *PPL*, 565 U.S. at 600 ("The Montana Supreme Court further erred as a matter of law in its reliance upon the evidence of present-day, primarily recreational use of the Madison River"); *Brewer Elliot Oil & Gas Co. v. United States*, 260 U.S. 77, 86 (1922) (affirming finding of non-navigability based on the "[v]oluminous testimony" considered "with all evident care" by the district court); and *United States v. Brewer-Elliot Oil & Gas Co.*, 249 F. 609, 623 (W.D. Okla. 1918) (holding segment non-navigable despite finding that *"[s]kiffs could be used at any time"* on that segment of the Arkansas river) (emphasis added). *See also Oregon*, 295 U.S. at 21-23 (affirming holding of non-navigability despite evidence of use by rowboats, canoes and other "light draft" craft, rejecting reliance on "evidence [that] shows an occasional use of boats, sporadic and ineffective" like that offered by Montana here). As the Eighth Circuit expressed this concept, in apparent frustration with the type of evidence proffered

17

to it much like that which Montana has proffered here, *"[t]here is a manifest difference* between public streams that can be used successfully for the running of boats and vessels for the purpose of commerce and those which are only capable of being used for the floatage of lumber and logs in rafts or single pieces" or by "skiffs and dugouts" or for other "navigation in small boats." *Gratz v. McKee*, 270 F. 713, 716-717 (8th Cir. 1920) (citations omitted, emphasis added) (holding Little River in Missouri non-navigable), *aff'd*, *McKee v. Gratz*, 260 U.S. 127 (1922).

Montana errs by relying on lower court cases (mostly decided between the Supreme Court's *United States v. Utah*, 283 U.S. 64 (1931) decision, and *PPL*) without considering whether those cases are consistent with *PPL*, and involved the same type of navigability at issue here. *PPL* was unequivocal "that the test for navigability is not applied in the same way in these distinct types of cases." *PPL*, 565 U.S. at 592. The *PPL*-Court explained that "admiralty jurisdiction extends to water routes made navigable even if not formerly so . . . and federal regulatory authority encompasses waters that only recently have become navigable . . . were once navigable but are no longer . . . or are not navigable and never have been but may become so by reasonable improvements . . . ." *Id.* at 592-93 (citations omitted). The Court continued that, "[w]ith respect to the federal commerce power, the inquiry regarding navigation historically focused on interstate

18

commerce . . . . And, of course, the commerce power extends beyond navigation." *Id.* at 593 (citations omitted).

Certain *pre-PPL* lower court decisions erroneously applied broad regulatory navigability standards in equal-footing doctrine, title navigability cases. For example, *Oregon v. Riverfront Protection Ass'n*, a title navigability case, cited regulatory navigability case law for the proposition that a "use of the river need not be without difficulty, extensive, or long and continuous." 672 F.2d 792, 795 (9th Cir.1982) (citing *Puget Sound Power & Light Co. v. Fed. Energy Regul. Comm'n*, 644 F.2d 785, 789 (9th Cir. 1981), citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 409-10 (1940), and *The Montello*, 87 U.S. 430, 441-43 (1874)). Even after *PPL*, the Oregon Court of Appeals in *Hardy v. State Land Bank* P.3d 647 (Ore. App. 2015), applied an "infirm legal understanding" in "determining navigability which would enlarge what actually passed to [a] State" when it entered the Union. *PPL*, 565 U.S. at 604-05. Only by ignoring the distinction between regulatory navigability and title navigability can Montana argue that the susceptibility for navigation by *non*-commercially viable vessels is relevant under the equal-footing doctrine.

Beyond their lack of usefulness for commercial purposes like that of larger vessels (*e.g.,* steamboats) capable of carrying huge tonnages of cargo and large numbers of travelers, the other reason such small craft as those championed by

19

Mr. Cajune (much less logs) are not relevant to title navigability is obvious: Particularly on steep rivers as these here, such small craft do not even travel both ways, so not on "a highway" at all, much less "a highway of commerce." *See, e.g., Utah*, 283 U.S. at 80 (confirming non-navigability of Cataract Canyon segment despite one-way usage by thrill seekers documented by the Special Master); *Utah v. United States*, 304 F.2d 23, 26-27 (10th Cir. 1962) (affirming *non*-navigability of segment of the San Juan river left unadjudicated in the earlier *Utah* litigation, despite evidence that Indians "made and used small boats for ferrying purposes in going to and returning from trading posts;" and that "a few of the prospectors went downstream in small rowboats constructed locally and took with them small amounts of supplies, bedrolls, and equipment," but *"[n]one of them came upstream in boats"*).  In this light, Mr. Cajune himself proved the uselessness of such small craft for realistic commerce on the segments here by conceding such craft traveled (and travel) only one way – down the riffles and rapids, not up them, and must be returned to their starting points by other means (like a pickup truck pulling a boat trailer) or left to rot or burn. 5 Trial Tr., pp. 1037-38, 1108; NW/TalenFOF¶380.

A river segment is non-navigable when there are "commercially realistic" modes in use on other parts of a river, but *not* the segment at issue.  That was true for steamboats below Thompson Falls and below Fort Benton, which were the historical heads of navigation on the Clark Fork and the Missouri rivers, *i.e.,* the

20

endpoints of these highways of commerce.  This concept of "the head of navigation" is an important one, which Montana tries to ignore, but the controlling Supreme Court caselaw will not allow it to do so.  *See, e.g., Brewer-Elliot*, 260 U.S. at 86 (affirming district court's conclusion of non-navigability at *"locus in quo"* beyond "the head of navigation" at "the mouth of the Grand River, near which was Fort Gibson"); *Oklahoma v. Texas*, 258 U.S. 574, 589-90 (1921) (rejecting title navigability for the river beyond Lanesport, Arkansas, "the usual head of navigation"); *see also Alcoa*, 853 F.3d at 153 (finding supportive of *non-navigability*, historical evidence that "the Moravians transported their goods to market using wagons [which] would often be taken to the heads of other rivers [they] used for navigation," but not to points on the relevant segment).

Equally important, it should not be forgotten that a river segment is non-navigable on which *no* modes of trade and travel on water were "commercially realistic" at time of statehood.  In the Eddy segment, for example, neither the upland steamboat nor any of the modes suggested by Montana were commercially realistic, as conclusively shown by the fact that the Eddy segment was not used for trade and travel in commerce by *any* watercraft.  Roads, and later railroads, were the commercial modes for realistic commercial trade and travel above Thompson Falls before and after statehood.  The railroads, or knowledge of their eventual

21

arrival, did not "drive out" commercial river traffic on the Eddy Segment – there was simply no commercial *waterborne* traffic to be driven out.[5]

Under Montana's "any boat" approach, no river segment anywhere in Montana (or any other state) would be immune from state land grab provided only that "any boat" could hypothetically make it through the segment one-way, as illustrated by Montana's insistence that Thompson Falls, Bear Trap Canyon, Beartooth Rapids, Sheep Creek Falls and Lone Pine Rapids are "navigable" because an experienced whitewater enthusiast could thread the rapids.  The invitation to negate *PPL's* "commercial reality-customary mode" mandate must be rejected.

### III.   CONCLUSION

Montana had a decade to develop its case, historians and other experts at its beck and call, and yet failed the task assigned to it in the *PPL* mandate – establish with competent evidence that the river segments at issue were used by customary watercraft as highways of commerce, or if they were not, prove why such non-usage was due to something other than the non-navigability of the disputed segments in their natural and ordinary conditions at statehood.  Montana failed this

---

[5]   In any event, in *Oklahoma*, the Supreme Court found evidence of highwater, difficult commercial navigation on a river being supplanted "[w]hen the railroads were constructed," to be proof of *non*-navigability of the supplanted segment, not proof of its susceptibility for commercial navigation.  258 U.S. at 589-90.

task.  In fact, it proved the opposite – showing, along with Defendants' experts, that although segments above and below the disputed segments were used in commerce, the disputed segments were *not* so used, and were, thus, *not* navigable for title purposes.  Applying the instruction manual that is the *PPL* opinion to the evidence offered at trial, this Court should so rule.

DATED this 6th day of October 2022.

/s/ *Robert L. Sterup*
Brown Law Firm

/s/ *Kyle A. Gray*
Holland & Hart LLP

ATTORNEYS FOR TALEN MONTANA, LLC

23

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, Kyle A. Gray, certifies that Defendant Talen Montana, LLC's Response Brief to the State of Montana's Amended Findings of Fact and Conclusions of Law complies with the requirements of Rule 7.1(d)(2).  The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch.  The total word count is fewer than 6,500 words, excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

*/s/ Kyle A. Gray*

19953875_v2

24